WALLACE B. DONHAM, receiver, *vs.* PUBLIC SERVICE COMMISSIONERS.

Suffolk.  January 22, 23, 1919. — February 28, 1919.

Present: RUGG, C. J., LORING, BRALEY, CROSBY, & CARROLL, JJ.

*Public Service Commission. Bay State Street Railway. Constitutional Law. Receiver. Equity Pleading and Practice*, Parties. *Fall River.*

In a suit in equity under St. 1913, c. 784, § 27, by the receiver of the property of the Bay State Street Railway Company to review, annul, modify or amend an order of the public service commission cancelling a schedule of fares filed by the plaintiff and ordering him to file a new schedule in substantial compliance with certain rates, fares and charges fixed by the commission, it appeared that, owing to the existence of a transitional period due to the great war and the unusual increases in all the costs of operation, neither the schedule of fares proposed by the plaintiff nor that established by the order of the public service commission would yield revenue sufficient to meet the fixed charges of operation and of interest, allow the setting apart of any substantial or adequate sum for depreciation and pay any dividend upon the fair value of the property or the amount of honest investment. The schedule proposed by the plaintiff was in substance to do away with tickets, to establish city zones with a uniform ten cent fare and to divide the country lines into zones about two miles in length with a minimum fare of ten cents for two zones and five cents for each succeeding zone. The order of the commission authorized for a brief trial period an increase in rates, which in the opinion of the commissioners seemed likely to produce a larger actual gain in receipts than the fares proposed by the receiver and which would result in less serious damage to the community, leaving the future to be dealt with in a manner to be indicated thereafter. For the trial period the commission fixed the fares on city lines at seven cents, to be made available to the public only through the purchase of tickets or tokens at the rate of five for thirty-five cents, with the proviso that cash fares should be ten cents each. On the country lines the commission approved for the trial period the schedule of the receiver except that the receiver had the option of making the minimum for a single zone five cents in cash or of following the plan fixed for the cities of selling tickets at the rate of five for thirty-five cents. The commission ordered that the new schedule should be made effective for a trial period of two months,

and that, if at the end of that time it had in combination with any other factors that might exist produced an increase in gross earnings of fifteen per cent or more, the experiment should be tried for two months longer, in the hope that the situation might be improved further by action of the General Court or by a change in economic conditions. *Held,* that it could not be said that the rates established by the public service commission were plainly unreasonable to the extent of affording less revenue to the receiver than the rate proposed in his schedule, and that the period fixed for the experiment, being four months at most and perhaps only two, could not be said to be excessive.

In the case above described it also was *held* that the order fixing the city fare at seven cents but providing that the public could avail themselves of this rate only by a purchase of at least five tickets or tokens at one time was authorized by the provisions of St. 1913, c. 784, and was just and reasonable.

In the same case it was *held* that the order of the public service commission did not violate any constitutional right of the receiver or of the Bay State Street Railway Company secured by arts. 10, 12 of the Declaration of Rights or by the Fourteenth Amendment to the Constitution of the United States.

In the case above described it was *pointed out* that the decision was confined to the facts disclosed by the record, and that it was not necessary to consider whether circumstances might arise where the public service commission would be warranted, or whether under the present circumstances they might be warranted, in establishing rates likely to yield a revenue less than the rates proposed by the receiver or less than a fair interest on the capital honestly and prudently invested.

In the case above described it also was *held* that the city of Fall River was not a proper party to the suit, the public interests being entrusted to the Attorney General.

BILL IN EQUITY, filed in the Supreme Judicial Court on December 24, 1918, and amended on January 13, 1919, under St. 1913, c. 784, § 27, by the receiver of the property of the Bay State Street Railway Company to review, annul, modify or amend an order of the public service commission made on December 20, 1918, cancelling a schedule of rates, fares and charges filed by the plaintiff as receiver of the property of the Bay State Street Railway Company and requiring that company through the receiver to file a schedule or schedules of tariffs in substantial compliance with certain rates, fares and charges fixed by the commission, alleging that the order of the commission in effect denied to the receiver a reasonable return for the service rendered and a fair return upon the investment honestly and prudently made and that it denied to him the equal protection of the laws and deprived him of his property held as such receiver without due process of law in violation of arts. 10 and 12 of the Declaration of Rights and of the Fourteenth Amendment to the Constitution of the United States.

The case came on to be heard upon the amended bill and answers

and a stipulation before *De Courcy*, J., who by agreement of the parties reserved it for determination by the full court and also reported for such determination the question whether or not the city of Fall River was entitled to be heard as a party to this proceeding, it being agreed that the counsel for Fall River might be heard on this report before the full court.

*S. H. Pillsbury & F. B. Greenhalge,* for the receiver.

*W. H. Hitchcock,* Assistant Attorney General, for the public service commissioners.

*C. R. Cummings,* for the city of Fall River.

RUGG, C. J.   This is a suit in equity brought by the receiver of the Bay State Street Railway Company against the public service commissioners under the authority of St. 1913, c. 784, § 27, "to review, annul, modify or amend" orders and rulings of the defendants respecting fares to be charged by the street railway company. The allegations of fact contained in the petition, to which is annexed a copy of the report and order of the public service commissioners here complained of, are admitted by the answer. The case is reserved upon the bill and answer and a stipulation incorporating in the record certain decisions of the public service commissioners. The plaintiff was appointed receiver on December 12, 1917, and since then has been operating and managing the street railway. The street railway is extensive in miles of track and number of municipalities served, furnishing urban and interurban transportation for the people residing in eighteen cities varying in size from Fall River, with a population of one hundred twenty-four thousand seven hundred ninety-one, to Woburn with sixteen thousand four hundred and ten inhabitants, and thirty-six or more country towns, in the eastern part of the Commonwealth. It is described as "one of the largest street railway systems, in point of mileage, in this country. On June 30, 1914, it operated, in all, nine hundred and fifty-one miles of single track. It owned eight hundred and ninety-seven miles, located in Massachusetts, all of which it operated except twenty-seven miles in the southern part of Boston." 4 Mass. P. S. C. Rep. 8. It operates in Boston only to a limited extent and barely touches New Bedford. Excluding those cities, the population of the territory served is one million, three hundred and thirty-five thousand seven hundred and eighty-seven.

The receiver in October, 1918, filed with the public service commissioners under the provisions of § 20 of said c. 784, a schedule of proposed fares and charges (being increases), in substance eliminating all reduced rate tickets except tickets for pupils in the public schools, establishing enlarged city zones with a uniform cash fare of ten cents and dividing its country lines into zones or sections about two miles long with a minimum cash fare of ten cents good for two zones or sections, and five cents for each additional zone or section thereafter. The receiver estimated that the proposed rates would produce annually from two million to two million and a half dollars additional revenue. The public service commissioners held hearings in accordance with § 21 of the act and in December, 1918, filed a report in general disapproving the proposed rates and requiring the receiver to cancel them and to file a new schedule in substantial compliance with the rates, fares and charges fixed by the commission in its findings and conclusions. The schedule of fares outlined in the report of the public service commissioners was to continue for a tentative trial period of two months. It is the contention of the receiver that the schedule and order of the public service commissioners withholds from him as receiver a reasonable return for the service rendered and a fair recompense upon the investment honestly and prudently made in the property, and thus deprives him of his property without due process of law, denies him the equal protection of the laws, and that the rates, fares and charges established by the report and order of the public service commissioners are unjust, unreasonable and confiscatory.

The pertinent provisions of the statute, so far as concerns the powers of the public service commissioners respecting rates, are in §§ 21 and 22 of said c. 784. Succinctly stated the street railway company, when a change in rates is proposed, must file a schedule showing present rates and proposed changes. Thereupon the public service commissioners may hold a hearing and in case an increase of fares is proposed, "the burden of proof to show that such increase is necessary in order to obtain a reasonable compensation for the service rendered" shall be upon the street railway company. "Reasonable compensation for the service rendered" is the test established, when a decrease in rates is asked, for the exercise of the power of the public service commissioners, "to determine what

will be the just and reasonable rate or rates, fare or fares." § 21. Whenever, after hearing, the public service commissioners are of opinion that the "rates, fares or charges or any of them . . . are unjust, unreasonable, unjustly discriminatory or unduly preferential or in any wise in violation of any provision of law, or that the rates, fares or charges or any of them . . . are insufficient to yield reasonable compensation for the service rendered and are unjust and unreasonable, the commission shall determine the just and reasonable rates, fares and charges to be charged for the service to be performed, and shall fix the same by order. . . ." The scope of the powers conferred by the statute upon the public service commissioners is far reaching. Subject only to the limitations that the fares, rates and charges must "yield reasonable compensation for the service rendered" and must be "just and reasonable" having relation to "the service to be performed" and must not violate any provision of law, its powers are ample. *Arlington Board of Survey* v. *Bay State Street Railway*, 224 Mass. 463, 469. It is implied from the nature of statutory law that the powers of boards of public officers thereby created must always be exercised subject to the provisions and guarantees of the Constitution of the Commonwealth and that of the United States. It is not contended by the receiver that the public service commissioners have exceeded their statutory powers (save in one particular hereafter to be noted) unless they also have transgressed the restrictions imposed by the Constitutions of the State and nation.

The rule established by the public service commissioners for their guidance in fixing rates in an earlier case and apparently intended to be followed by them in others, so far as applicable, is that under the Massachusetts law "capital honestly and prudently invested must, under normal conditions, be taken as the controlling factor in fixing the basis for computing fair and reasonable rates," and that "such rates are to be allowed as will yield a fair return upon such investments." *Bay State Rate Case*, 4 Mass. P. S. C. Rep. 11, 12.

In an earlier hearing where the subject of the amount of capital honestly and prudently invested by the Bay State Street Railway Company and then usefully employed in its business was considered exhaustively, the public service commissioners decided that amount to be $39,104,340, and that the rate of income to which it

fairly was entitled was six per cent per annum. 4 Mass. P. S. C. Rep. 52, 64, 66. These figures plus investments shown to have been made since and now approximating $41,170,000, as the present total prudent and usefully employed investment, appear to be assumed as substantially correct by the public service commissioners in their report and order now under review.

The present situation as to estimated expenses and income is set forth in the report of the commissioners, with accompanying schedules as follows: —

"The company's petition for higher fares is based upon a statement of operating results under present conditions. For the year ending December 31, 1918, these figures are as follows (9 months actual, 3 months estimated):

| | |
|---|---:|
| Operating expenses | $8,790,767 |
| Taxes | 484,720 |
| Depreciation | 1,104,000 |
| Total | $10,379,487 |
| Gross income | 10,045,464 |
| Deficiency | $334,023 |
| Six per cent upon investment | 2,470,200 |
| Total deficiency | $2,804,223 |

The present fares, however, have only been in effect since June, and the same is true of certain increases in wages. On December 6, 1918, moreover, the national war labor board granted further increases in wages estimated by the company to amount to about $875,000 yearly. Assuming, then, a full year's operation on the basis of present fares and present wages, the figures above given are changed, as follows:

| | |
|---|---:|
| Operating expenses | $10,233,000 |
| Taxes | 484,720 |
| Depreciation | 1,104,000 |
| Total | $11,821,720 |
| Gross income | 10,466,000 |
| Deficiency | $1,355,720 |
| Six per cent upon investment | 2,470,200 |
| Total deficiency | $3,825,920 |

These figures are only approximate and are open to criticism in
certain respects.  The margins are so wide, however, that there is
no room for doubt that the company is in dire need of a large
amount of additional revenue, even if dividends on stock are left
out of consideration."

The chief reasons for this situation are said to be, (1) heavy
increase in wages likely to absorb sixty-five to seventy per cent of
yearly receipts on present basis; (2) great increase in cost of steel,
coal, copper and other materials necessary for operation; (3) offset
of increase in fares by loss of traffic; (4) the adverse conditions of
poor equipment; (5) lack of profit on many country lines; (6) the
wide prevalence of the epidemic known as influenza, a factor
seriously affecting receipts during October and November, 1918.

It thus is manifest from the record and is in substance conceded
by both the receiver and the Attorney General, that neither the
schedule of fares proposed by the receiver nor that established by
the order of the public service commissioners will yield revenue
sufficient to meet the fixed charges of operation and of interest,
allow the setting apart of any substantial or adequate sum for
depreciation, and pay any dividend upon the fair value of the
property, or the amount of honest investment.

The question of law in essence under these circumstances is
whether, when confessedly the schedule of fares presented by the
receiver will not yield a revenue sufficient to meet fixed charges
and necessary expenses of the street railway company, and to pay
any substantial return upon the capital value, it is within the
power of the public service commissioners to change that schedule
of fares by making changes.  We put the question thus broadly
because, whether the rates of fares as presented in the schedule of
the receiver be lowered or raised, cogent arguments might be
advanced that the revenue likely to be raised thereby would be
less than that which would be realized from the schedule of the
receiver.

The subject of rate making or rate revision by the Legislature
or by public officers established by legislative authority, has not
been much discussed in the decisions of this court.  *Arlington
Board of Survey* v. *Bay State Street Railway,* 224 Mass. 463.  *Fall
River* v. *Public Service Commissioners,* 228 Mass. 575, 580.  *National
Dock & Storage Warehouse Co.* v. *Boston & Maine Railroad,* 227

Mass. 197. In the opinion in the last named case it was said at page 202 that the duty of the public service commission was to determine a rate which "would be fair and reasonable and not confiscatory." The subject, however, has been much discussed in decisions of the United States Supreme Court. It was said in *Smyth* v. *Ames,* 169 U. S. 466, at pages 522, 523: "What amounts to deprivation of property without due process of law or what is a denial of the equal protection of the laws is often difficult to determine, especially where the question relates to the property of a *quasi* public corporation and the extent to which it may be subjected to public control. But this court, speaking by Chief Justice Waite, has said that, while a State has power to fix the charges by railroad companies for the transportation of persons and property within its own jurisdiction, unless restrained by valid contract, or unless what is done amounts to a regulation of foreign or interstate commerce, such power is not without limit; and that 'under pretence of regulating fares and freights, the State cannot require a railroad corporation to carry persons or property without reward, neither can it do that which in law amounts to the taking of private property for public use without just compensation, or without due process of law.' *Railroad Commission Cases,* 116 U. S. 307, 325, 331. This principle was recognized in *Dow* v. *Beidelman,* 125 U. S. 680, 689, and has been reaffirmed in other cases. In *Georgia Railroad & Banking Co.* v. *Smith,* 128 U. S. 174, 179, it was said that the power of the State to prescribe the charges of a railroad company for the carriage of persons and merchandise within its limits — in the absence of any provision in the charter of the company constituting a contract vesting it with authority over those matters — was 'subject to the limitation that the carriage is not required without reward, or upon conditions amounting to the taking of property for public use without just compensation.'" In *Reagan* v. *Farmers' Loan & Trust Co.* 154 U. S. 362, 412, occurs this statement: "It is unnecessary to decide, and we do not wish to be understood as laying down as an absolute rule, that in every case a failure to produce some profit to those who have invested their money in the building of a road is conclusive that the tariff is unjust and unreasonable. And yet justice demands that every one should receive some compensation for the use of his money or property, if it be possible without prejudice to the rights of

others. There may be circumstances which would justify such a tariff; there may have been extravagance and a needless expenditure of money; there may be waste in the management of the road; enormous salaries, unjust discrimination as between individual shippers, resulting in general loss. The construction may have been at a time when material and labor were at the highest price, so that the actual cost far exceeds the present value; the road may have been unwisely built, in localities where there is no sufficient business to sustain a road. Doubtless, too, there are many other matters affecting the rights of the community in which the road is built as well as the rights of those who have built the road."

The property of the street railway "corporation has been devoted to a public use. There is always the obligation springing from the nature of the business in which it is engaged — which private exigency may not be permitted to ignore — that there shall not be an exorbitant charge for the service rendered. But the State has not seen fit to undertake the service itself; and the private property embarked in it is not placed at the mercy of legislative caprice. It rests secure under the constitutional protection which extends not merely to the title but to the right to receive just compensation for the service given to the public." *Minnesota Rate Cases,* 230 U. S. 352, 433, 434. It was said in *Missouri, Kansas & Texas Railway* v. *Interstate Commerce Commission,* 164 Fed. Rep. 645, at page 648 (three Circuit judges sitting, of whom Mr. Justice Van Devanter was one): "To be just and reasonable, within the meaning of the constitutional guaranty, the rates must be prescribed with reasonable regard for the cost to the carrier of the service rendered and for the value of the property employed therein; but this does not mean that regard is to be had only for the interests of the carrier, or that the rates must necessarily be such as to render its business profitable, for reasonable regard must also be had for the value of the service to the public. And where the cost to the carrier is not kept within reasonable limits, or where for any reason its business cannot reasonably be so conducted as to render it profitable, the misfortune must fall upon the carrier, as would be the case if it were engaged in any other line of business." See *Northern Pacific Railway* v. *North Dakota,* 236 U. S. 585, and cases collected at page 600; *Municipal Gas Co. of Albany* v. *Public Service Commission,* 225 N. Y. 89.

The finding of the rate making power should always be accorded respect and given every rational presumption in its favor. "Judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for public use." *San Diego Land & Town Co.* v. *National City,* 174 U. S. 739, 754.

We adopt in general these quoted statements as the law respecting the scope of regulation by public authority of the rates, fares and charges of corporations exercising public franchises.

It seems to us unnecessary to consider the somewhat broader statements of the rate making power to be found in other decisions, or what may be the rule where the trend of events has depreciated the value of the capital investment originally made honestly and prudently. See *Brunswick & Topsham Water District* v. *Maine Water Co.* 99 Maine 371, 381; *Puget Sound Electric Railway* v. *Railroad Commission of Washington,* 65 Wash. 75, 87; and *Covington & Lexington Turnpike Road Co.* v. *Sandford,* 164 U. S. 578.

We are dealing in the case at bar with an amount of honest investment of capital about which there is no controversy and with a present management, which according to the report "has been industrious" "to make every feasible effort to secure economy of operation." While the public service commissioners offer a few suggestions for the future and make some criticisms of management and of a very few salaries paid, these are comparatively insignificant. As the report states, "it is clear that the chief factor in the present unfortunate plight of the company is the recent extraordinary rise in wages and prices, rather than any of these things. It is a condition by which the public is now confronted. The problem is not one of securing any immediate return of any particular amount on the investment, but of meeting the necessary and unavoidable cost of furnishing the service. If the railway should be sold at receiver's sale and even if it should be split up into a number of different parts, the same problem would remain under present conditions."

The situation disclosed on this record has not arisen in any

other case, so far as we are aware. But the principles declared in these somewhat analogous instances afford a guide for the deduction of the sound rule, which will protect the constitutional rights of the company and the receiver and at the same time be just to the public interests.

The property of the street railway company has been devoted to the public service of furnishing transportation. Conditions not attributable to the fault of the stockholders or managers of the company have arisen, which render it impossible for the receiver to collect an amount from the present rates which will yield revenue sufficient to be compensatory for the investment made. The receiver voluntarily has determined, by filing his schedule of rates, to operate the system upon a basis of revenue for the immediate future not sufficient to meet the requirements of compensatory return upon the investment. Unless it is clear that the rate established by the public service commissioners is reasonably certain to afford less receipts than that proposed by the receiver, he has suffered no injury and hence in equity there would be no reason to revise the report and order of the public service commissioners.

We proceed to a more detailed consideration of the report of the public service commissioners. From that it appears that since October 1, 1916, there have been four increases of fares over the whole or parts of the system of the company. The estimates of the company or its representatives were that these increases would produce $2,791,000 in additional revenue. The actual augmentation of revenue, on the contrary, including about $100,000 of enlarged freight receipts, was $1,099,783. As already stated, the schedule now proposed by the receiver is in substance to eliminate all tickets including workmen's tickets, to establish city zones with a uniform ten cent fare and to divide the country lines into zones about two miles in length with a minimum fare of ten cents for two zones and five cents for each succeeding zone. With reference to this it is said in the report that in no other communities of similar size in the United States is a minimum fare of ten cents charged or even proposed, and that nowhere else in the country is so radical and burdensome an increase of fares made or proposed as compared with that of October 1, 1916, on the Bay State system. It is said, also, "In the first 'Bay State Rate Case' the

commission held that, to sustain the burden of proof imposed by the statute, the company must 'satisfy the commission that there is at least a reasonable prospect that' the change in fares desired will result in an increase in revenue' (4 Mass. P. S. C. Rep. 14). In the present instance the receiver and the management apparently believe that the new tariff will produce substantially the gain in revenue estimated. On the other hand, the remonstrants, many of them official representatives of the cities and towns involved, were unanimous in expressing the conviction that a ten cent minimum fare will be disastrous in its effect upon the company itself; and it is our belief that they were entirely sincere in this expression. It is also within our knowledge that many street railway officials are skeptical as to the wisdom of so high a minimum rate. Street railway fares have been more frequently and more generally raised in Massachusetts than in any other part of the country, and while it cannot be said that no advantage to the companies has resulted, it is true that in nearly every case the gain in revenue has been less — and often far less — than the previous estimates. Other factors have entered in, but, making all due allowances, it is quite clear that increases in fares impose a burden upon the public which considerably exceeds the benefit which they bring to the companies." The report contains a careful analysis of the increases of fare allowed since October, 1916, which shows that the percentage of the present increase proposed in the schedule of the receiver over the fares and charges on that date range in various instances from fifty to four hundred per cent and in numerous places are about two hundred per cent. The following excerpts from the report fairly state the additional grounds of the public service commissioners for refusing to accept the estimate of the receiver as to the probable increase of revenue from the increases in fares proposed by him: "The cities served by the Bay State are compact, the distances are short, and the population made up on the whole of persons of very moderate means. It is possible that there are sufficient patrons who cannot find other means of transportation, who cannot walk or move their place of residence, and who are obliged to use the Bay State cars, so that revenue advantage may be gained from the proposed new fares. Our experience in many other cases, however, leads us to place little faith in the estimates of gain submitted, and to

share the fears expressed by the representatives of the communities. The best that can be said of the new schedule, from the point of view of the company, is that it is *a chance*, the risk of which is increased by the fact that the service is poor and will continue to be poor, under the most favorable conditions which can be anticipated, for some time to come. Viewing the new rates from the public point of view, there is a certainty of a most disturbing effect. It is impossible to raise fares within a period of two years to the extent proposed in the company's new tariff without disrupting and dislocating the conditions to which community life has become adjusted. The new schedule means that the company will practically abandon the short-haul business in the city centres, and from the centres to the nearby suburban towns the rates will be so increased that it is difficult to believe that much regular daily traffic can in the long run be preserved. Still more disturbing, moreover, is the fact that, even if the new fares should prove unsuccessful in producing the revenue desired, experience has shown that it would be well nigh impossible thereafter to reduce them." The report proceeds: "Under present abnormal conditions, dealing with a situation so critical as the one by which we are now confronted, where the solution offered by the company is so uncertain and hazardous, we believe we are justified in disregarding speculative estimates or arbitrary rules and in taking the action which our best judgment leads us to believe will secure the best net results for all concerned. The company is in dire need of additional revenue, if only to provide a safe margin above necessary expenses of operation. Stating our proposition broadly, we propose to authorize for a brief trial period an increase in rates which seems likely, in our opinion, to produce a larger actual gain in receipts than the tariff proposed by the company and will at the same time result in less serious damage to the community, leaving the future to be dealt with in a manner which we shall hereinafter indicate." The fares fixed by the report on city lines are in general seven cents, to be made available to the public only through the purchase of tickets or tokens at the rate of five for thirty-five cents, with the proviso that cash fares shall be ten cents each. On the country lines the report approved the schedule of the receiver except that the company is offered the option of making the minimum for a single zone five cents in cash or following the same plan

established for the cities of selling tickets or coupons at the rate of five for thirty-five cents.

The report shows, however, that this proposal is tentative only. The present is treated as a transition period. It is recognized that no one can be sure what the course of prices will be or what the immediate future has in store in other respects. The public service commissioners say: — "It is our plan that the new schedule above outlined be made effective for a trial period of two months. If at the end of that time it has, in combination with any other factors which may enter in, produced an increase in gross earnings, in comparison with the corresponding period of the previous year, of fifteen per cent or more, after making allowance for loss of revenue on any lines which may have been discontinued, it is our judgment that the experiment ought to be continued for a similar period, in the hope that the situation may be further improved by action of the General Court, or by a change in economic conditions. In other words, a gain of this character will be solid and substantial ground for encouragement, and for the expectation of even better results in the future. It will be a gain far better than this or other companies have in general been able to secure from any changes in rates which have yet been made. If maintained and gradually improved throughout the year, it should also be sufficient to cover operating expenses, taxes, interest on debt, and some provision for depreciation. If, however, such an increase in revenue is not realized during the period of two months, or is not substantially maintained thereafter, the commission will not stand in the way of a trial of the schedule which the company now proposes. In such an event the situation will in our judgment be so critical that we would not be justified in interposing further obstacles to this experiment."

Considerable space in the report is devoted to the permissive Spec. St. of 1918, c. 188, whereby the General Court offered to the directors and stockholders of the Bay State Street Railway Company opportunity for reorganization upon such basis that the annual interest and dividend charges should not exceed six per cent on the amount found by the public service commissioners in 1916 to have been honestly and prudently invested in the property, added to the like investments made since. That scheme provides for management for a period of ten years by a board of

trustees appointed by the Governor, and the fares are to be established and automatically adjusted upon a so called "service-at-cost" principle "as far as is consistent with the public interest and reasonably practicable." This permissive statute contemplates the raising of $1,000,000 in cash and the immediate sale of $2,500,000 of bonds for the uses of the reorganized company. This statute has no direct bearing upon the rates of fare. It is, however, one of the factors to be thought of in connection with the permanent future of the company. We do not understand that the public service commissioners attributed to it any weight in reaching its decision. It simply is one of the elements considered in common with others indicating the abnormal present conditions and the necessity of bridging the transitional period.

These copious extracts from the report of the public service commissioners appear to us to make manifest a purpose to deal fairly with the company, while at the same time having due regard for the interests of the public. Comparative revenue likely to be derived under the two schedules is largely a matter of prophecy. The wide discrepancies between the anticipation of accessions to income expressed by the representatives of the company when the former increases in fares were made, and the realization in actual receipts by experience, naturally cause one to hesitate to give absolute credence to the opinion now expressed by the company and its representatives respecting the return likely to be gained from the schedule of fares presented by the receiver. There appears to be good ground for the belief that the plan proposed by the public service commissioners will be as profitable as that set forth in the receiver's schedule. The fifteen per cent increase of income proposed by the commissioners, when applied to the "Company's estimate of revenue for full year under present fares, based on experience," would be, as we understand it, a proportionately larger realization of the company's estimate of additional revenue to be produced from the receiver's proposed schedule of fares than has been realized by experience as compared with its estimates of additional revenue to be produced from the four increases in fares made since October 1, 1916. In any event, it seems to us impossible to predict with any assurance that the increased rates proposed by the public service commissioners will not be productive of as much additional revenue as would the

rates proposed in the receiver's schedule. It cannot be asserted that they will produce less additional revenue.

The situation here disclosed seems to bring the present case within the category of "cases where the evidence as to the probable result of the rates in controversy would show that they were so nearly adequate [that is to say, so nearly equivalent to the amount likely to be realized from the schedules proposed by the receiver] that nothing but a practical test could satisfy the doubt as to their sufficiency." *Willcox* v. *Consolidated Gas Co.* 212 U. S. 19, 50. The circumstances during the period covered by the report have been extraordinary by reason of the war and the unusual increases in all the costs of operation of the street railway system. All the conditions have been and still are "too abnormal to enable us to say that the commission's rates are confiscatory." *Darnell* v. *Edwards*, 244 U. S. 564, 570.

Taking the report as a whole, not over emphasizing subsidiary paragraphs but giving it fair interpretation as a composite unit, we do not think it can be said that the rates established by the public service commissioners are plainly unreasonable to the extent of affording less revenue to the street railway company than the rates proposed by the receiver in his schedule.

The period of time for experimentation proposed by the public service commissioners, (being not over four months in the aggregate and possibly not over two months) in order to determine by actual experience whether its rates yield as much as the estimates of those proposed by the receiver, diminished by the proportion of excess shown to exist in previous estimates of the street railway company over actual experience, cannot be said to be excessive.

Particular attack is made upon the order of the public service commission respecting fares upon city lines. These are the words of the order: "In the cities the company may combine the present inner and outer zones into one area, *charging a 7-cent fare by the sale of 5 tickets or metal tokens for 35 cents.* For the purpose of encouraging the use of tickets, and in this way avoiding the difficulty in fare collection which arises when pennies are involved, the cash rate may be made 10 cents, but it is the purpose to make the real fare 7 cents, readily available to all riders. The tickets or tokens are to be sold by conductors on the cars, and it is a part of the plan that patrons shall be informed by the con-

ductors that they may be obtained. . . ."   6 Mass. P. S. C. Rep. 186.

It is contended that this part of the order is beyond the power of the public service commission.  The argument in brief is that § 19 of said c. 784 confers power to make orders respecting the issuance of tickets only when the schedule presented by the carrier offers tickets as a part of its proposed fares and that, since the schedule of the receiver dealt only with cash fares, the public service commission can make orders with respect to cash fares alone.

This is too narrow a construction of the statute.  Its other sections show that the powers of the public service commission are limited only by the requirement that they be "just and reasonable."  § 22.  The order in the case at bar means that the fare is fixed at seven cents but that for practical reasons the members of the public can avail themselves of this rate only by making an initial purchase of at least five tickets.  The fare is not established at ten cents.  A different question might be presented if a cash fare were established as the standard and then the company were required to issue commutation or reduced rate tickets against its will.  The unit fare is established at seven cents as just and reasonable.  But the public service commissioners say that, to prevent confusion and delay, and to minimize the losses arising from dishonesty on the part of the travelling public and of conductors, and perhaps for other reasons, at least five tickets or tokens must be purchased at one time.  The power to make such an order is within the authority conferred by the statute.  *Arlington Board of Survey* v. *Bay State Street Railway,* 224 Mass. 463, 469. *Fall River* v. *Public Service Commissioners,* 228 Mass. 575, 580.

Such an order does not seem to us to be irrational.  *Swan* v. *Manchester & Lawrence Railroad,* 132 Mass. 116.  *Martin* v. *Rhode Island Co.* 32 R. I. 162.  See note in Ann. Cas. 1912 C 1290, for collection of cases.  Standing by itself it does not appear to us to violate any of the constitutional rights of the street railway company, or to be in conflict with any constitutional principle declared in *Lake Shore & Michigan Southern Railway* v. *Smith,* 173 U. S. 684, as limited by *Pennsylvania Railroad* v. *Towers,* 245 U. S. 6.  *Northern Pacific Railway* v. *North Dakota,* 236 U. S. 585.

We are of opinion that it does not appear that the report and

order of the public service commissioners are violative of any constitutional right of the receiver or of the street railway company.

Answering now the precise question of law, posited at the outset of the review of decisions as the crucial one in the case at bar, in the light of the statements quoted and decisions cited, we are of opinion that, where by all parties in interest the times are recognized as abnormal and the particular period as one of transition so that both the receiver of the street railway and the public service commissioners by their words and conduct agree that any substantial return upon the capital honestly and prudently invested must, even under wisely economical management, be suspended temporarily and that any rates established at the moment are likely to be impermanent and experimental, the public service commissioners are not, under either the Constitution of Massachusetts or that of the United States, deprived of power to modify the schedule of rates, fares and charges proposed by the receiver, but that the public service commissioners may make such changes therein as in its judgment are required by the public interests and the rights of the owners of invested capital, when the revenue to be derived therefrom is not thereby substantially diminished below that likely to be derived from the rates proposed by the receiver. The rate making power established by legislative authority is not stripped of all functions because extraordinary conditions have sprung into existence, which the owners of the privately owned public utility recognize as preventing them from deriving any income for the time being from their investment; but the commission still may exercise its judgment for the protection of the public interests when it does not reduce substantially the revenue, proposed to be exacted from the public by the owners of the public utility. Simply because such owners are for the moment failing to receive the just compensation to which in the long perspective they are entitled, they are not thereby necessarily at liberty to fix their own terms. Their property is still affected with a public interest.

The result here reached appears to us in harmony with the decisions, to which reference has been made, and is fairly deducible from them. We perceive nothing at variance with it in *Lake Shore & Michigan Southern Railway* v. *Smith,* 173 U. S. 684, much relied on by the receiver, as modified by *Pennsylvania Railroad* v.

*Towers,* 245 U. S. 6, 17, or in *Denver* v. *Denver Union Water Co.* 246 U. S. 178, and *Detroit United Railway* v. *Detroit,* 248 U. S. 429.

We do not find it necessary to discuss whether circumstances may arise where the public service commissioners may be warranted, even under circumstances such as are here disclosed, in establishing rates likely to yield a revenue less than that likely to be derived from those proposed by the receiver, or less than a fair interest on the capital honestly and prudently invested. The present decision is confined to the facts disclosed on this record.

A further question is reserved on this report. It is whether the city of Fall River is entitled to be heard as a party in this proceeding. It is not named as a party in the petition. It contends that it is a party and has a right to be heard as such, and its counsel declined to accept the opportunity offered by the single justice that he might be heard as *amicus curiae.* That contention rests in part upon St. 1918, c. 144, which requires written notice to be given by the public service commission, upon the filing of any petition or schedule for change in rates of fare upon a street railway, to the mayors of all cities and the selectmen of all towns in which the street railway operated, or which would be affected by the proposed change. Reference is made, also, to St. 1918, c. 288, which authorizes a city or town under certain conditions to contribute to the cost of operation and fixed charges of a street railway within its limits, although it is not contended that Fall River has thus made any contribution to the support of the Bay State Street Railway Company.

The proceedings before the public service commissioners are in part investigations into facts. It is often, if not always, necessary or desirable to ascertain local conditions. One way to obtain such information would be from the executive officers of the municipalities affected. When the public service commission has concluded its investigation, it makes an order and the statute imposes upon the commission the duty to enforce that order or to defend that order if attack is made upon it. St. 1913, c. 784, § 28. When proceedings are instituted in court, the matter is one between the public service commission and the complaining party. Other parties are sometimes joined in the petition, and occasionally undertake the burden of supporting the order of the commission. *Bulkeley* v. *New York, New Haven, & Hartford*

*Railroad,* 216 Mass. 432. *Western Union Telegraph Co.* v. *Foster,* 224 Mass. 365. *Fall River* v. *Public Service Commissioners,* 228 Mass. 575. *Bay State Street Railway* v. *Public Service Commissioners,* 229 Mass. 399.

It has not been contended that Fall River under § 27 may not itself bring a petition. See *Fall River* v. *Public Service Commissioners, post,* 329. That affords ample relief to any municipality affected.

It is urged that the phrase "The burden of proof," beginning the fourth sentence of § 27 of said c. 784, implies trials of facts in the Supreme Judicial Court on petitions like that here pending, and that hence all parties heard or entitled to be heard before the public service commission have a right to be heard here. That phrase warrants no such inference. The power of this court under that section is confined to dealing with "rulings or orders of the commission which are unlawful to the extent only of such unlawfulness." Manifestly no power to rehear facts is conferred by these words. *Paine* v. *Newton Street Railway,* 192 Mass. 90. The findings of fact of the commission are not to be reviewed or revised by the hearing of evidence in a case like the present.

When constitutional questions are involved the court will examine the report of the public service commissioners for the purpose of reaching their own conclusions, not fettering their discretion or judgment by artificial rules as to the weight of the findings in the report, but attributing to the report and to its several parts all the force and effect to which its substance and a consideration of the expert nature of the commissioners' investigations and conclusions naturally entitle it. *Knoxville* v. *Knoxville Water Co.* 212 U. S. 1, 8.

It would be quite unusual for the Legislature to require or permit as parties to a proceeding like this, all cities and towns through which a common carrier operated its lines. Such a construction of the statute would offer the opportunity for protracted delay in the enforcement of the orders of a public board created by the Legislature for the purpose of making decisions which are designed to be enforced without delay since they are given special precedence. § 27 of said c. 784. On principle and on a true construction of the statutes, the city of Fall River is not a proper party to this suit. The public interests are entrusted to the

Attorney General. *Attorney General* v. *Williams,* 178 Mass. 330,
334. *Chandler* v. *Railroad Commissioners,* 141 Mass. 208. *Norwood*
v. *New York & New England Railroad,* 161 Mass. 259, 268. *Dwyer*
v. *New York, New Haven, & Hartford Railroad,* 209 Mass. 419.
*Davis* v. *County Commissioners,* 153 Mass. 218. *Central Bank &
Trust Corp.* v. *Cleveland,* 164 C. C. A. 446; 252 Fed. Rep. 530.

*Petition dismissed.*