LEWIS S. CHILSON & others *vs.* MAYOR OF ATTLEBORO & others.

Bristol.   October 22, 23, 1923. — January 2, 1924.

Present: RUGG, C.J., BRALEY, DECOURCY, & PIERCE, JJ.

*Municipal Corporations.  Norton, Taunton and Attleboro Street Railway. Street Railway.  Tax, Betterment, Abatement.  Certiorari.  Estoppel. Laches.*

Action by the city of Attleboro, in conjunction with the city of Taunton and the towns of Norton and Mansfield, in purchasing under the provisions of Spec. St. 1919, c. 208, the shares of the capital stock and bonds of the Norton, Taunton and Attleboro Street Railway Company, did not constitute an acquisition under the power of eminent domain or by immediate purchase of the franchise, rights and properties of the street railway company under the authority conferred by § 2 of the special statute, and, after the purchase of such stock and bonds, the municipalities did not " operate the said street railway," but the corporate entity of the street railway company continued without interruption or alteration; and therefore the municipalities had no authority or power to assess upon owners of real estate under the provisions of § 9 of the special statute a betterment tax for the payment of any part of the purchase price paid for such stock and bonds.

An assessment for betterments purporting to have been levied by the city of Attleboro in 1920, in the circumstances above described, under § 9 of Spec. St. 1919, c. 208, was not ratified and validated by the provisions of St. 1921, c. 176.

The fact, that the owners of land upon whom the betterment tax above described purported to have been assessed filed a petition under § 12 of the

special statute for an abatement of the assessment, was not an election of remedy which would constitute a bar to a petition subsequently filed for a writ of certiorari directing the mayor and members of the city council of the city of Attleboro to certify their records with relation to such tax to the end that it might be quashed.

A petition for a writ of certiorari in the circumstances above described is a proper remedy.

The mere fact, that the petitioners for the writ of certiorari in the circumstances above described delayed filing their petition for three years after the levying of the tax which they sought to have declared void, did not amount to laches nor raise an estoppel which would bar the proceedings.

PETITION, filed on September 21, 1923, in the Supreme Judicial Court for the county of Bristol against the mayor and members of the municipal council of the city of Attleboro for a writ of certiorari directing the respondents to certify their records with relation to betterment assessments purporting to be laid upon the petitioners on November 9, 1920, under the provisions of Spec. St. 1919, c. 208, to the end that such tax might be quashed.

The facts were agreed upon. Material facts alleged in the return by the respondents and in the agreed statement of facts are described in the opinion.

The petition was reserved by *Crosby,* J., upon the petition, answer and agreed statement of facts for determination by the full court.

Spec. St. 1919, c. 208 is as follows:

" Section 1. The cities of Taunton and Attleboro, and the towns of Norton and Mansfield, may, jointly or severally, subscribe for, purchase and hold shares of the capital stock, bonds and notes of the Norton, Taunton and Attleboro Street Railway Company or of its successors or assigns, hereinafter designated as the company, to such maximum amounts as shall be authorized by the public service commission hereinafter called the commission: provided, however, that said cities and towns, jointly or severally, shall not subscribe for, purchase or hold shares of the capital stock, bonds or notes of the company unless such subscription or purchase shall, in the aggregate, amount to seventy-five per cent of such shares, bonds or notes now outstanding. If additional stock is voted by the board of directors, the

same shall not be issued until the said cities and towns, jointly or severally, shall subscribe for or purchase, in the aggregate, not less than seventy-five per cent of such issue. The mayor of said cities and the chairmen of the selectmen of said towns shall have power to vote the shares of stock in the company held by their respective municipalities.

" Section 2. The said cities and towns, jointly or severally, may purchase or take by right of eminent domain the franchise, rights and properties held or used by the company; and the said cities and towns, jointly or severally, shall, upon acquiring such property, be vested with all the powers and privileges, and shall be subject to all the duties, liabilities, and restrictions set forth in all general laws now or hereafter in force relating to street railway companies: provided, as to each of said towns, that such subscription, purchase or taking is approved by vote of two thirds of the voters thereof present and voting thereon at any legal town meeting called for the purpose within five years after the passage of this act, and, as to each of said cities, that such subscription, purchase or taking is approved by the governing board thereof empowered to appropriate money, within said five years. In case the parties in interest are unable to agree as to the compensation to be paid for any property or interest taken by right of eminent domain, hereunder, the same shall be determined in the manner provided by law in respect to takings for highway purposes.

" Section 3. Each of said cities and towns, for the purposes aforesaid, may incur indebtedness outside the statutory limit, and may issue, from time to time, bonds or notes to an amount not exceeding the amount of the said subscription or the cost of the purchase or taking by the city or town. Such bonds or notes shall bear on their face the name of the city or town followed by the words: Street Railway Loan, Act of 1919, shall be payable at the expiration of periods not exceeding twenty years from the dates of issue, shall bear interest at such rates as may be fixed by the officers authorized to issue the bonds or notes, and shall be signed in accordance with section eight of chapter seven hundred and nineteen of the acts of nineteen hundred and

thirteen. The said cities and towns may sell the said securities at public or private sale, or pledge the same for money borrowed for the purposes of this act, upon such terms and conditions as they may respectively deem proper, but not for less than their par value, and the proceeds, except premiums, shall be used only for the purposes herein specified.

" Section 4. Each of said cities and towns shall, at the time of authorizing the said loan, provide for the payment thereof in accordance with the provisions of section fourteen of said chapter seven hundred and nineteen, so that each loan will be extinguished within the time prescribed by this act, and when a vote to that effect has been passed, a sum, which with the income derived from the said railway or railway securities, and from assessments collected under the provisions of section nine, will be sufficient to pay the interest as it accrues on said bonds or notes, and to make such payments on the principal as may be required under the provisions of this act, shall, without further vote, be assessed and collected by the said cities and towns annually thereafter in the same manner as other taxes, until the debt incurred by the loan is extinguished.

" Section 5. Each of said cities or towns may, upon each terms and subject to such restrictions as may, from time to time, be prescribed by the commission as consistent with the public interest, contribute to the cost of operation and fixed charges of the company's line within such city or town, to an amount not exceeding in any one year one dollar per one thousand dollars of the preceding year's assessed valuation in such town, and not exceeding fifty cents per one thousand dollars of the preceding year's valuation in such city.

" Section 6. In case two or more of the said cities and towns jointly purchase or take the said street railway or those parts thereof situated in such cities or towns, the mayors of the cities and the chairmen of the selectmen of the towns, so purchasing or taking, shall constitute a joint board to manage the said railway, or the parts thereof so purchased or taken, and the said board may appoint a superintendent

who shall have charge of the maintenance, repair and operation of the said railway or parts thereof, subject to the rules, regulations and orders of the said board.

" Section 7. In case any one of the said cities or towns purchases or takes and operates that part of the said railway which is situated in such city or town, the mayor, if it be a city, with the approval of the municipal council, and the selectmen, if it be a town, may appoint a superintendent who shall have charge of the maintenance, repair and operation of the said part of the said railway, subject to such rules, regulations and orders as may be made or imposed by the municipal council, with the approval of the mayor, or by the selectmen, with the approval of the voters of the town given at a town meeting duly called for the purpose.

" Section 8. In case the said cities and towns purchase the stock of the company, or a part thereof, in accordance with the provisions of section one, then the directors of the company, and in case the said cities and towns, or any of them, acquire and operate the said railway, or any part thereof, as above provided, then the joint board provided for by section six, or the mayor or selectmen, as provided in section seven, shall, from time to time, fix just and equitable rates and shall file with the commission, and shall plainly print and keep open to public inspection, schedules showing all rates, joint rates, fares, classification and charges for any service of any kind rendered or to be rendered by it, and all conditions and limitations, rules and regulations, forms and contracts in any manner affecting the same, in such places, within such times, and in such forms, and with such detail as the commission may order. Fifty legal voters of a city or town in which the said street railway is situated, may apply to the commission, who, after due notice, shall hear the parties interested, and thereafter may revise and regulate the rates and fares established as aforesaid, so far as the same shall be shown to be unjust, unreasonable, or more than sufficient to yield reasonable compensation for the service rendered. The findings of the commission shall be final and conclusive for one year, subject,

however, to the right of either party to appeal, as provided in section twenty-seven of chapter seven hundred and eighty-four of the acts of nineteen hundred and thirteen.

"Section 9. In case the said cities and towns, or any of them, jointly or severally, shall purchase or take and operate the said street railway, or any part thereof, a portion of the purchase price, not exceeding fifty per cent, paid by any such city or town, may be assessed upon the owners of estates in such city or town specially benefited thereby and not more than one mile distant from the line so acquired. Said assessment may be proportioned to the frontage of area of the estates assessed or, to their average assessed valuation for the years nineteen hundred and sixteen, nineteen hundred and seventeen, and nineteen hundred and eighteen, or the assessment may be determined in the same manner as assessments for street improvements. But in no case shall the amount of the assessment upon any particular estate exceed the benefit to that estate arising hereunder.

"Section 10. In case an assessment is to be made as aforesaid, then, within one year after the said street railway, or any part thereof, has been purchased or taken as herein provided, the municipal council, in the case of a city, and the selectmen, in the case of a town, shall file a certificate and plan in the office of the collector of taxes of the respective cities and towns, designating the estates assessed and setting forth the names of their supposed owners, the area assessed, and the amount of assessment to be paid by each owner; and the collector of taxes shall forthwith make a demand in writing for the payment of such assessments, and every such owner shall within three months after the demand is served on him or on the occupant of his estate, or sent by mail to the last address of the owner known to the collector, pay to the collector the sum so assessed or charged, with interest at the rate of six per cent per annum, which shall begin to run thirty days after the date of the notice: provided, that the board of assessors shall, on the written request of any such owner, made within the said three months, apportion such assessment or charge into such number of equal parts, not exceeding ten, as the owner shall designate

in his request; and they shall certify the apportionment to the collector. Interest from the date of the apportionment at the rate of six per cent per annum shall be added to each of said assessments or charges until they are paid, and one of said parts, with interest on all unpaid parts, shall thereafter be added by the assessors to the annual tax on the said estates for each year ensuing, until all of said parts have so been added, unless sooner paid as hereinafter provided; and provided, further, that nothing herein contained shall be construed to prevent the payment, at any time, in one payment or two or more parts of any balance of any assessment then remaining unpaid, notwithstanding the prior apportionment, but interest on the balance at the rate of six per cent per annum shall be paid to the date of such payment; and thereupon the collector shall receive the same and shall certify the payment or payments to the assessors, who shall preserve a record thereof.

" Section 11. An assessment made hereunder shall constitute a lien upon the estate, which shall continue for three years after said certificate is filed and demand is made as above provided, or, in case of apportionment, until the expiration of two years after the date when the last instalment is committed to the collector; and said assessment, together with interest at the rate of six per cent per annum, may, with incidental costs and expenses, be levied by sale of the estate or so much thereof as will be sufficient to discharge the assessment and interest and intervening charges. If the assessment is not paid within three months after the service of said notice, or, if apportioned, within three months after any part has become due, such sale and the proceedings connected therewith shall be conducted in the same manner in which sales for the non-payment of taxes are conducted; and the estate so sold may be redeemed in the same manner as if it has been sold for non-payment of taxes. The assessments or parts thereof may also be collected by an action of contract, in the name of the city or town against the owner of the estate, brought at any time within three years after the same has become due.

" Section 12. Any person aggrieved by an assessment

may, at any time within three months after the service of the demand mentioned in section ten of this act, apply to the Superior Court of the county for a jury to review the same; but before making such application he shall give to the municipal council, or the selectmen, fourteen days' notice in writing of his intention so to do, and he shall particularly specify his objections to the assessment, to which specification he shall be confined before the jury.

" Section 13. This act shall take effect upon its passage."

Section 1 of St. 1921, c. 176 is as follows:

" Section 1. The municipal council of the city of Attleboro· may abate the whole or a proportionate part, as it may determine, of all assessments for betterments made under authority of Part 1 of chapter one hundred and eighty-seven of the Special Acts of nineteen hundred and eighteen or of chapter two hundred and eight of the Special Acts of nineteen hundred and nineteen, or both. If any of such assessments have already been paid, the city treasurer of said city is hereby authorized to refund the whole or a proportionate part thereof in accordance with the aforesaid determination of the municipal council."

*J. E. Macy*, for the petitioners.

*S. P. Hall*, for the respondents.

RUGG, C.J. This is a petition for a writ of certiorari to quash a betterment assessment purporting to be laid under Spec. St. 1919, c. 208. The petitioners are some of the landowners upon whose estates betterments have been assessed. The respondents are the mayor and municipal council of the city of Attleboro, who made the assessment. The act in question empowered the cities of Taunton and Attleboro and the towns of Norton and Mansfield to acquire and operate the Norton, Taunton and Attleboro Street Railway. That street railway corporation owns about twenty miles of railway located in these four municipalities, approximately two miles of which lie within the boundaries of the city of Attleboro. Authority was conferred by § 1 of the act upon the four municipalities to " subscribe for, purchase and hold shares of the capital stock, bonds and notes of " the street railway company upon conditions there stated.

Authority was conferred by § 2 of the act upon the municipalities to "purchase or take by right of eminent domain the franchise, rights and properties held or used by " the street railway company upon compliance with terms therein set forth.   Thus a choice between two courses was open to the municipalities: (1) by § 1 they could become the owners of the stock and bonds of the street railway company and through the corporation and its officers use its powers and whatever rights it had; (2) by § 2 they could exercise either the power of immediate purchase or the power of eminent domain and thus become the direct owners of the physical properties previously belonging to the street railway company and operate the railway accordingly.   By option (1) the municipalities would become the virtual owners of a corporation and be bound by all the limitations and possess all the immunities of stockholders and bondholders of a corporation.   The operation of the street railway would of necessity under this option be through the corporation.   By option (2) the municipalities would become direct owners of all franchises and properties formerly owned by the corporation, possessing all the rights and powers and subject to all the obligations and liabilities incident to direct ownership of physical and intangible property.   The operation of the street railway would under this option be vested directly in the municipalities and the corporation would be eliminated.   The choice thus afforded to the municipalities was between two courses differing one from the other both in form and in substance, and involving dissimilar rights, powers, obligations and liabilities.

The city of Attleboro, acting in conjunction with the other three municipalities, exercised the option thus offered and elected to proceed under § 1 of the act.   The stocks and bonds of the street railway company were purchased. The share of the cost falling to the city of Attleboro was $30,000.

The transaction was a purchase by the four municipalities of the stocks and bonds of an existing corporation.   It was in no sense an acquisition, under the power of eminent domain or by immediate purchase, of the franchises, rights

and properties of the street railway under the authority conferred by § 2 of the act. The corporate entity of the street railway company continues without interruption or alteration. The stockholders and creditors of the corporation have changed. The corporation itself remains unchanged.

Subsequently the municipal council of the city of Attleboro laid an assessment upon lands of the petitioners among others. The only authority for the assessment of betterments is in § 9 of the act. Its words, so far as now relevant, are, " In case the said cities and towns·. . . shall purchase or take and operate the said street railway . . . a portion of the purchase price, not exceeding fifty per cent, paid by any such city or town, may be assessed upon the owners of estates in such city or town specially benefited thereby . . . ."

The authority to assess a betterment is conferred only in the event that the named municipalities " shall purchase or take and operate the said street railway." These vital words of the authority to assess betterments follow the words of § 2, wherein the power of eminent domain is conferred to " purchase or take " the assets of the street railway company. These words are significantly different from those of § 1, under which the municipalities have acted, wherein the authority conferred is to " subscribe for, purchase and hold shares of the capital stock, bonds and notes " of the street railway company. The word " purchase " is common to § 1 and § 2, but its context in the two sections is quite different. In § 1 the reference is to a purchase of the " shares of the capital stock, bonds and notes " of the street railway. In § 2 the reference is to a purchase of " the franchise, rights and properties held or used by the company." The line of demarcation between the acquisition of the stocks and bonds of the corporation by private negotiation and purchase under § 1 and the acquisition of the franchises, rights and properties of the corporation either by purchase or eminent domain under § 2 is maintained throughout the act. In §§ 2 and 3, where reference is made to both methods, the words used are " subscription," " purchase " or " taking," combining thus the essential words

both of § 1 and of § 2.   Provision is made in §§ 6 and 7 for
the management of the street railway in case of purchase or
taking, manifestly referring to the method of acquisition
authorized by § 2.   In § 8, where provision is made for the
establishment and revision of fares, occurs distinct reference
to the two different methods of acquisition.   To recur to the
operative words of § 9, the four municipalities did not "pur-
chase or take " and do not " operate the said street railway."
They have purchased the shares of capital stock and the
bonds of a corporation which itself continues to operate the
street railway.

The conclusion follows that as matter of construction of
the act the authority to assess betterments was conferred
under § 9 only in the event that the title to the property and
franchises of the street railway company vested directly in
the municipalities by the proceedings authorized under § 2
and does not exist in the event, which has occurred, of a
purchase and holding of the shares of capital stock and
bonds under § 1.

Practical considerations support this interpretation.
Authority to assess betterments can be granted under the
Constitution only when based on special and peculiar
benefits to defined property.   The assessment of a sub-
stantial part of the cost of an investment by a municipality
in stocks and bonds of a private corporation forms a novel
basis for a betterment assessment.   Such an investment
partakes of the nature of a private business adventure.
The mortgage securing the bonds of the company may be
foreclosed.   G. L. c. 160, § 55; c. 161, § 25.   The corpora-
tion may sell its property to or consolidate with other com-
panies under certain conditions.   G. L. c. 161, §§ 62–69.
A receiver may sell all its property.   G. L. c. 161, §§ 135–
137.   *Federal Trust Co.* v. *Bristol County Street Railway,*
218 Mass. 367.   In other ways it may be that financial
reverses would wipe out the investment.   The entire control
of the street railway is left in the corporation and remains
under the direction of its governing officers.   It is subject
to all the exigencies which, as appears from recent litigation
before this court, surround the private operation of street

railways. See, for example, *Donham* v. *Public Service Commissioners*, 232 Mass. 309, *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403. A special benefit of a permanent nature would not be likely to be predicated by legislative enactment upon such an insubstantial foundation. *Sayles* v. *Board of Public Works of Pittsfield*, 222 Mass. 93. *Sears* v. *Board of Aldermen of Boston*, 173 Mass. 71. *Sears* v. *Street Commissioners*, 180 Mass. 274. *Weed* v. *Mayor & Aldermen of Boston*, 172 Mass. 28.

This is not one of those exceedingly rare instances where the corporate entity can be disregarded. See *Montgomery* v. *Forbes*, 148 Mass. 249. The statute itself involves continued existence and recognition of the corporation in the circumstances which have come to pass. Ownership by the municipalities of all the stock and bonds of the corporation does not affect the corporate individuality as separate and distinct from those who have title to its securities. *Brighton Packing Co.* v. *Butchers Slaughtering & Melting Association*, 211 Mass. 398, 403, 404. *Marsch* v. *Southern New England Railroad*, 230 Mass. 483, 498. *Eastman Marble Co.* v. *Vermont Marble Co.* 236 Mass. 138, 153. *Osgood* v. *Tax Commissioner*, 235 Mass. 88, 91. *Bachrach* v. *Commissioner of Banks*, 239 Mass. 272, 274.

The assessment here assailed cannot fairly be held to have been ratified and validated by St. 1921, c. 176. That act simply empowers the municipal council of the city of Attleboro to abate the whole or a proportionate part of the assessments levied under the assumed authority of Spec. St. 1918, c. 187, Part I, and Spec. St. 1919, c. 208. A statute of such narrow purpose and carefully restricted phrase cannot be stretched to cover an intent which commonly is expressed by positive and unequivocal words. The case of *Warren* v. *Street Commissioners*, 187 Mass. 290, bears no resemblance to the case at bar.

The fact that the petitioners have brought petitions for abatement of their assessments under § 12 of said c. 208 is no bar to the maintenance of the present proceeding. They might not be able to question the validity of the assessment in a petition for its abatement. *American*

*Unitarian Association* v. *Commonwealth,* 193 Mass. 470, 478. Compare *Milford Water Co.* v. *Hopkinton,* 192 Mass. 491, 498. They have a right by an independent proceeding to assail the validity of the assessment. There is no election of remedy under such circumstances. *Corbett* v. *Boston & Maine Railroad,* 219 Mass. 351. *Frost* v. *Thompson,* 219 Mass. 360, 369. *Jennings* v. *Wall,* 217 Mass. 278.

Certiorari is a proper remedy to redress the wrongs of which complaint here is made. *Bowditch* v. *Superintendent of Streets of Boston,* 168 Mass. 239, 241, and cases collected. *Boston & Lowell Railroad* v. *County Commissioners,* 198 Mass. 584, 586.

There is no estoppel against the petitioners arising from the delay of almost three years after the levy of the assessment before bringing this petition. No bar arises through laches. Ordinarily such delay would be fatal to a petitioner for certiorari. *Byfield* v. *Newton,* 247 Mass. 46, and cases there collected. The case at bar is not an instance where in the meantime expenditures have been made or obligations incurred, or where rights have been established or affected by the delay. The assessment was not authorized by law. It exceeded the power of the respondents. The delay affords no reason for allowing such an invalid assessment to stand. *Hancock* v. *Boston,* 1 Met. 122. *Boston & Albany Railroad* v. *County Commissioners,* 116 Mass. 73, 83.

*Writ to issue.*