The Syrian Antiochean St. George Orthodox Church of Worcester *vs.* George D. Ghize & others.

Worcester.     September 27, 1926. — January 3, 1927.

Present: Rugg, C.J., Braley, Crosby, Carroll, & Wait, JJ.

*Corporation*, Religious, What constitutes corporate action, Termination. *Equity Pleading and Practice*, Intervenor, Supplemental bill, Decree.

A corporation was incorporated in 1908 under R. L. c. 125 "for the purpose of the establishment and maintenance of a place for religious worship." In 1917, after such corporation had "remained dormant" and had "been abandoned so far as the members of the said corporation could so abandon it," a second corporation was organized by the majority of the members of the first corporation, owing to a controversy among the worshipping congregation, for the purpose, among others, "of taking over and acquiring the present real estate, furniture, personal property and equipment of" the first corporation. In 1920 the first corporation was the legal owner of a deposit made in a savings bank in 1913, and intervened as an adverse claimant in a suit in equity brought by the second corporation to get possession of the account. While the suit was pending, notices purporting to call a meeting of the corporate members of the first corporation were sent out. Of the fourteen original incorporators, eight were present at the meeting; one was out of the country and could not be notified; one could not be found; one was dead; one was represented by a proxy at the meeting; and two, although they knew of the meeting, were not served with notice and were not present nor represented. At the meeting, a vote was passed consenting to a decree in favor of the delivery of the bank account to the second corporation. *Held*, that

(1) For lack of notice to all the corporate members of the first corporation, the meeting was not legal and its action was without effect;

(2) A decree in accordance with the vote at the meeting was not warranted;

(3) Mere omission to continue actively to exercise its function as a corporation did not work a forfeiture of the corporate franchise of the first corporation;

(4) The incorporation of the second corporation for the purpose named in its charter did not work a succession to the legal title to the property of the congregation without a transfer, assignment or conveyance from the holder of the title, the first corporation: the two corporations were separate and distinct legal entities;

(5) The first corporation held the legal title to the bank account and the congregation held the equitable title;

(6) A final decree ordering payment of the account to the second corporation was reversed;

(7) A religious congregation actively maintaining public worship in a place of permanent abode being the beneficiary of the fund, and the proceeding being in equity, it would be contrary to fundamental conceptions of equitable jurisprudence to order a trust fund into the keeping of a trustee, even though holder of the legal title, so neglectful of all its obligations to maintain its active corporate existence and to administer the trust fund as the first corporation was shown on this record to be;

(8) *It was ordered*, that, if the first corporation should hold a meeting of its incorporators, elect officers, and pass appropriate votes authorizing some officer to receive and hold the fund and administer the trust as established by the master's report, then a decree might be entered declaring it to hold the legal title to the deposit in trust for the congregation.

A corporation organized under G. L. c. 180 can come to an end only by some act of the sovereign power by which it was established: it can be extinguished under our laws only by the General Court acting within the appropriate scope of the legislative power, by the judgment of a court of competent jurisdiction, or by proceedings for surrender of charter or dissolution under some statute. Per RUGG, C.J.

BILL IN EQUITY, filed in the Superior Court with a writ of summons and attachment dated May 18, 1920, against George D. Ghize and The Worcester County Institution for Savings.

The bill is described in the opinion.

St. George Syrian Orthodox Church was allowed to intervene as an adverse claimant.

The suit was referred to a master. Material facts found by the master and set out in his original and supplemental reports are described in the opinion. The suit was heard by *Flynn*, J., who ordered an interlocutory decree confirming the master's report and a final decree directing the payment of the deposit of $1,388.05 to the plaintiff. From a final decree entered in accordance with such order, the intervenor appealed.

*M. M. Taylor*, for the intervenor, St. George Syrian Orthodox Church.

*C. E. Tupper*, for the plaintiff.

RUGG, C.J. This suit in equity is brought to recover a deposit in a savings bank standing in the name of "St. George Orthodox Church, Worcester." Neither of those

named as defendants in the suit claim title to the deposit. They defend simply to protect themselves. The deposit is claimed by the St. George Syrian Orthodox Church, which was permitted to intervene, and the suit became a controversy between the plaintiff and the claimant. The case was referred to a master. His findings of fact are final because there is no report of the evidence. *Glover* v. *Waltham Laundry Co.* 235 Mass. 330, 334.

The facts, so far as relevant to the grounds of this decision, are these: The savings bank deposit, which alone is the subject of the present suit, was made on September 13, 1913, and was $1,100. The funds represented by this deposit were collected from time to time from contributions made by members of the Syrian religious congregation in Worcester for general church purposes and not for any use otherwise specified. No additions or withdrawals have been made, so that at present the bank holds the amount of the original deposit with accrued dividends. Nothing appears to have been done with this deposit. No record was shown of any meeting of either the plaintiff or intervening corporation respecting this deposit or any claim thereto, and no such meeting was held or vote taken by either corporation. The deposit book at some time not shown by the report came into the possession of the defendant Ghize "through his holding the office of treasurer of the St. George Orthodox Church, Worcester."

These bald facts are supplemented by a brief history of the corporations and persons here involved and their relation to the church and religious worship. Since about 1900 there has been in Worcester an association of Syrian people regularly maintaining a place for religious worship. The St. George Syrian Orthodox Church was incorporated by charter dated in June, 1908, "for the purpose of the establishment and maintenance of a place for religious worship" in Worcester. The proceedings for incorporation appear to have been under R. L. c. 125, now G. L. c. 180, and not under R. L. c. 36, now G. L. c. 67. Conveyance of real estate was made to this corporation in the month of its incorporation, and the building thereon numbered 100 Wall Street has since

been used continuously to the present as a place of worship for a Syrian church congregation. In 1911 this corporation made conveyance of its real estate to one Bacela as a trustee to hold for the use and benefit of the "Syrian Congregation of the Greek Orthodox Church of Worcester, . . . with the special understanding and agreement he the said Trustee shall deed the same to whomever & whenever said Congregation shall by majority vote so indicate and request in writing." If this corporation, hereafter called the first corporation, transacted any other business than here stated, no records thereof were shown or proof made. This corporation held no regular meetings and did not assume to act in any capacity except as trustee for the congregation and for property held by it for the benefit of the congregation, and it has at all times recognized the authority of the congregation with respect thereto. In 1917, as a result of controversy within the Greek Orthodox Church in America, a new corporation was chartered under the name, Syrian Antiochean St. George Orthodox Church of Worcester. That corporation is the plaintiff. It will be designated herein as the second corporation. On the day following its incorporation Bacela conveyed the real estate, held by him in trust and used for worship by the Syrians, to the second corporation, which since has never done or assumed to do anything other than act as trustee in holding the legal title to property for the use and benefit of the Syrian congregation worshipping therein, the conduct and administration of all church affairs having been managed by the congregation. The controversy within the Greek Orthodox Church was general throughout America. It related to the question, whether ecclesiastical allegiance was due to the Synod of Russia or to the Patriarch of Antioch. Prior to 1916 the Worcester Greek Church had recognized allegiance to the Synod of Russia, but there was no church discipline, regulation or law which gave the Synod of Russia control over the property or business affairs, either of this Syrian congregation or church corporation. The master says, "I do not find however, that there was any exclusive jurisdiction in the United States over the Greek Orthodox Church, either

in the Patriarch of Russia or the Patriarch of Antioch, and that there is no canon, law or usage of the church which would prevent any congregation thereof in the United States from transferring its allegiance from one Patriarch to the other, if the consent of such Patriarch to accept such allegiance was obtained, and I find that the Patriarch of Antioch did consent to accept the allegiance of the plaintiff corporation and the Syrian congregation connected therewith."

The Worcester Syrian congregation, shortly before 1917, divided into two parties. The majority in number acknowledged allegiance to the Patriarch of Antioch and a large majority of the former members continued to occupy the church edifice used since 1908 and perhaps before. A meeting of the congregation was called for April 29, 1917, at which persons of both factions had an opportunity to attend. A record of this meeting, somewhat informal in nature, was made at a later time, which shows allegiance to the Patriarch of Antioch and a vote "to complete the name of our church as ought to be in adding the word Antioch and to register the same in the capital of State in Boston." These acts and votes of the congregation were in accordance with its usual practice and common usage. Although a substantial number favored the Russian Synod, a considerable majority were in favor of allegiance to the Patriarch of Antioch. It was in consequence of this expression of opinion that the second corporation was formed. As a result of the controversy within the Greek Orthodox Church in America, a substantial minority of those who had previously worshipped in the church edifice before mentioned withdrew and worshipped elsewhere.

Since the second corporation was established, the first corporation "has remained dormant, and has been abandoned so far as the members of the said corporation could so abandon it." The master states that he is unable to find who are the members or officers of the first corporation other than as they were set forth in the charter.

The conclusion of the master is that at the time of the deposit the legal title thereto was in the first corporation but "that the equitable title thereto was in the congregation

of said church, and that the corporation had no right or authority to use the same except as directed and authorized by said congregation. . . . I find that the equitable title to the fund in question is in the Syrian congregation at present worshipping at 100 Wall Street, Worcester, and the legal title thereto should be in the plaintiff."

After the filing of the master's report, motions to amend the bill by adding supplementary matter were filed on April 13 and on June 3, and were allowed on June 4, 1925. The allegations thus added in effect were that the first corporation "by its officers, trustees and incorporators" had consented to a decree that the funds in question be turned over to the plaintiff, and that the corporation, at a corporation meeting held on May 18, 1925, had adopted a vote to that end. Annexed to the first motion was a paper entitled "Consent to a Decree," signed by nine persons. The intervenor, being the first corporation, by its attorney answered, and the case was referred to the same master for report concerning the issues raised by the amendments and answer thereto. The report of the master touching the second reference to him in substance is that the signatures to the so called "Consent to a Decree" are all genuine and that the signers constituted a majority of the original incorporators of the first corporation; that, after the filing of the first motion to amend the bill, notices purporting to call a meeting of the incorporators of the first corporation were issued but were not served upon all the incorporators; that at a meeting held on May 18, 1925, eight of the fourteen original incorporators were present. Of the remaining six original incorporators, one was out of the country, one could not be found, one was dead, one was represented by proxy, and two knew of the meeting but were not served with any notice of it. Notices appear to have been served upon some who were not found to be members, but they were not present at the meeting. There is no finding that any of the notices for this meeting were signed by those actually holding office in the first corporation indicated on the notices. At the meeting thus called and held, a vote was passed con-

senting to a decree in favor of the present plaintiff with respect to the bank book here in controversy.

It is manifest that the supplemental report of the master does not show that any legal meeting of the first corporation has been held with respect to the present suit and consenting to decree against it. Notices to part, but not all, of the incorporators living in Worcester is all that is disclosed. A legal meeting of a corporation not attended by all the available incorporators cannot be called in this way. The action of the meeting of eight out of the fourteen original incorporators, held on May 18, 1925, is of no effect on the issues here depending. There were two at least of those incorporators living in Worcester who were not present at that meeting and who were not served with notice of the meeting. Whatever may be said or thought about the likelihood of corporate action to that end from the facts set forth in the record, there is no sufficient basis for a decree. A corporation is an artificial entity created by the law, which can perform corporate acts only in the manner pointed out by the statute or controlling principles of law. There has been no compliance with essential requirements in calling and holding the meeting of May 18, 1925.

Argument has been made to the effect that the first corporation has not authorized any intervention in this litigation hostile to the plaintiff. No proper steps have been taken to raise that question. The petition of the first corporation to intervene was allowed by the court.

The first corporation having received its charter from the Secretary of the Commonwealth, and having complied with the laws relative to incorporation, became a corporation and was entitled to all the rights, powers, privileges, and immunities, and possessed the characteristics inherent in bodies corporate under our laws. One of those characteristics is that mere omission to continue actively to exercise the franchise does not work a forfeiture of corporate existence. There is under our laws and statutes in general no express or implied condition annexed to the grant of power to be a corporation that there must be continuous active exercise of corporate functions in order to preserve them.

No special statute to that effect applicable to the first corporation appears in the record.   Whatever may be said about nonuse or misuse of corporate powers as ground for proceedings instituted by the Attorney General or otherwise in behalf of the Commonwealth to revoke or to forfeit the charter, it is plain that nonuser alone does not operate automatically as a surrender of the charter.   In its nature an act of incorporation is not a contract between the corporate body and the individuals composing it.   It is a compact between the creating government on the one side and the created corporation on the other side.   The corporation can come to an end only by some act of the sovereign power by which it was established.   It can be extinguished under our laws only by the General Court acting within the appropriate scope of the legislative power, by the judgment of a court of competent jurisdiction, or by proceedings for surrender of charter or dissolution under some statute.   See G. L. c. 155, §§ 50–55.   *Heard* v. *Talbot,* 7 Gray, 113, 119. *Attorney General* v. *Adonai Shomo Corp.* 167 Mass. 424. *Opinion of the Justices,* 237 Mass. 619, 623.   *Essex Co.* v. *Commonwealth,* 246 Mass. 242, 248, and cases there collected.

The incorporation of the second corporation, for the purpose among others "of taking over and acquiring the present real estate, furniture, personal property and equipment of the Syrian Congregation of the Greek Orthodox Church of Worcester," did not work a succession to that property without a transfer, assignment or conveyance from the owner of such property.   The two corporations were separate and distinct legal entities.   *Brighton Packing Co.* v. *Butchers' Slaughtering & Melting Association,* 211 Mass. 398, 403, 404.   *Chilson* v. *Mayor of Attleboro,* 247 Mass. 191, 202.

The legal conclusion to be gathered from all the findings of the master is that the first corporation holds the legal title to the deposit, and that the equitable title is in the Syrian congregation at present worshipping at 100 Wall Street in Worcester.   The first corporation in its petition to intervene prays that it may be admitted as a party, "in order that it may be eventually decreed, as between the plaintiff and

your petitioner, which one is entitled to the sum of money in issue in this case." While the conclusion is as above stated, nevertheless, this is a proceeding in equity. A religious congregation actively maintaining public worship in a place of permanent abode is the beneficiary of the fund. The legal title which is vested in the intervenor is not for its own benefit but for the ultimate use and benefit of that religious congregation. It would be contrary to fundamental conceptions of equitable jurisprudence to order a trust fund into the keeping of a trustee, even though holder of the legal title, so neglectful of all its obligations to maintain its active corporate existence and to administer the trust fund as the first corporation is shown on this record to be. If the first corporation holds a meeting of its incorporators, elects officers, and passes appropriate votes authorizing some officer to receive and hold the fund and administer the trust as established by the master's report, then a decree may be entered declaring it to hold the legal title to the deposit in trust for the said congregation. If, however, votes of a different nature are passed at such corporate meeting, appropriate final decree is to be entered upon the facts then disclosed. The final decree is reversed and the case remanded to the Superior Court for further proceedings not inconsistent with this opinion.

*Ordered accordingly.*