LOWELL GAS COMPANY *vs.* DEPARTMENT OF PUBLIC UTILITIES.

Suffolk.  October 4, 5, 1948. — March 11, 1949.

Present: QUA, C.J., LUMMUS, DOLAN, WILKINS, & WILLIAMS, JJ.

*Gas Company. Public Utilities. Equity Jurisdiction,* Public utilities. *Constitutional Law,* Due process of law, Public utilities. *Lowell Gas Company. Equity Pleading and Practice,* Bill; Demurrer; Review of order of department of public utilities; Master: appointment, reference.

A demurrer to a bill in equity in no event could raise any question of a "variance" between averments in the bill and findings of fact by a master to whom the suit was referred after an overruling of the demurrer.

Equity Rule 34 (252 Mass. 610) does not require that, in a suit in equity by a gas company under G. L. (Ter. Ed.) c. 25, § 5, seeking to have annulled as confiscatory a rate order of the department of public utilities, there be set out in the bill a summary of the evidence before the department when it made the order.

The Declaration of Rights of the Constitution of the Commonwealth guarantees to a public utility company, which alleges that confiscation of its property will result from a rate order of the department of public utilities, the right to submit that issue to a court for determination upon its own independent judgment as to both law and facts; and a remedy adequate to enforce that right is afforded the company by G. L. (Ter. Ed.) c. 25, § 5.

In a suit in equity by a gas company under G. L. (Ter. Ed.) c. 25, § 5, to annul a rate order of the department of public utilities on the ground that the rates are confiscatory and unconstitutional, the inquiry is not confined to the findings of the department or to the evidence on which they were based, but other evidence may be considered, including evidence of matters which took place after the hearing before the department and after the order was made.

In a suit in equity by a gas company under G. L. (Ter. Ed.) c. 25, § 5, to annul a rate order of the department of public utilities on the ground that it was confiscatory, the court had jurisdiction to appoint

a master "to hear the parties and their evidence, to find the facts and report the same to the court."

In a suit in equity by a gas company under G. L. (Ter. Ed.) c. 25, § 5, to annul a rate order of the department of public utilities, it appeared that the order contained no clear cut finding of a rate base to which a percentage of return to the company could be applied.

The department of public utilities erred as a matter of law in including in its computation leading to a fixing of rates for a gas company income derived from a merchandise and jobbing business in the sale and servicing of gas appliances which was separate from the supplying of gas.

In its computations leading to a fixing of rates for the Lowell Gas Company, the department of public utilities should have allowed as a charge against earnings, with priority over dividends, annual payments on certain noninterest bearing but legal obligations which the department contended represented "no real indebtedness of the company" but, in the circumstances, a "moral obligation" to certain of its customers.

Facts found by a master in a suit in equity by a gas company under G. L. (Ter. Ed.) c. 25, § 5, to annul an order by the department of public utilities fixing rates, that the reasonably to be expected annual earnings available for dividends on the basis of such rates would be less than $80,000, whereas the amount of annual earnings necessary to assure confidence in the financial integrity of the company so as to maintain its credit and attract new capital, was $202,405, required a conclusion that the order was confiscatory and required its annulment.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on June 10, 1947.

The suit was heard and reserved and reported to the full court by *Ronan*, J., upon the record described in the opinion.

*R. G. Dodge*, (*E. L. Twomey* with him,) for the plaintiff.

*D. H. Stuart*, Assistant Attorney General, for the defendant.

WILKINS, J. This is a bill in equity under G. L. (Ter. Ed.) c. 25, § 5, to annul a rate order of the department of public utilities on the ground that it is "confiscatory and unlawful." The plaintiff was incorporated by St. 1849, c. 234, "for the purpose of manufacturing and disposing of gas, in the city of Lowell, and its immediate vicinity," and has for many years supplied gas in that area. On December 12, 1946, it filed with the department a schedule

of increased rates, which was disallowed in an order dated April 15, 1947, containing an authorization to file a new schedule of lesser increases to become effective May 1, 1947. The plaintiff filed the new schedule, without prejudice to its contention that the order was unlawful. A demurrer to the bill of complaint was overruled, the case was referred to a master, and the department appealed. There was a hearing before the master, who filed a report and a supplemental report. An interlocutory decree was entered denying six motions of the department, four to recommit the case to the master, one to reopen the hearing, and one to amend the order of reference. Another interlocutory decree overruled the department's exceptions and confirmed the reports. The single justice reserved and reported the case upon the pleadings, a stipulation as to dates, and the foregoing rulings, "such decrees to be entered as justice and equity may require." G. L. (Ter. Ed.) c. 214, § 31.

The bill alleges, with supporting factual allegations, that the rate order "is confiscatory and unlawful in that it prevents the plaintiff from receiving a reasonable return on the fair value of its property and has the effect of depriving the plaintiff of property without due process of law contrary to arts. 10 and 12 of the Declaration of Rights and to the Fourteenth Amendment to the Constitution of the United States." Other allegations are that the order contains errors in computation and an error in law in including the anticipated amount of revenue to be received by the plaintiff on its merchandise business. The prayers are that the order be annulled, and that, pending final disposition, the order be stayed. [1]

The department's answer, which was filed without waiving its demurrer, in part alleged that "all allegations as to the fair value of the company's plant are not material in that a court is not bound to consider evidence of the fair or historical value of the company's plant in the determina-

[1] On July 31, 1947, an interlocutory decree temporarily enjoined the department from enforcing the order. The rates allowed by that order were in effect in May, June, and July, 1947, and the rates in the schedule filed December 12, 1946, have been in effect since August 1, 1947.

tion of rates"; that "the legality of the department's order must be judged by evidence before the department, and not by matters that have taken place since the hearing before the department and since its order was made"; that "the company is only entitled to rates that permit the company to operate successfully, maintain its financial integrity, attract capital and compensate its investors for the risks assumed"; that the increased revenues provided in the order "were, when added to a conservative estimate of net earnings based on the experience and evidence of the plaintiff, sufficient to attract capital to the company"; and that "no constitutional question is involved in the rate making process which is solely an exercise of the police powers of the State by its duly authorized regulatory body."

### The demurrer.

The demurrer was general to the whole bill, and properly was overruled if any case for relief is stated in the bill. *Lydia E. Pinkham Medicine Co.* v. *Gove,* 298 Mass. 53, 57. *Bleck* v. *East Boston Co.* 302 Mass. 127, 129. *O'Connor* v. *Brockton,* 308 Mass. 34, 36. In overruling it there was no error. Of the grounds now relied on, grounds 2 and 3 referred respectively to two paragraphs of the bill which were later amended, and those paragraphs as they stood before amendment are not in the record. Notwithstanding the department's contention, the demurrer in no event could raise any question of a "variance" between the bill and the master's findings. Likewise of no avail are those grounds which, in general (ground 10) or in particular respects (grounds 4 to 7, inclusive), set up that the bill fails to summarize the evidence before the department upon issues of which the plaintiff seeks redetermination. The department mistakenly relies upon the last paragraph of Equity Rule 34 (252 Mass. 610), which specifically refers only to review of orders of the department relating to the promotion and sale of securities. St. 1921, c. 499; see now G. L. (Ter. Ed.) c. 110A, § 13, as appearing in St. 1932, c. 290, § 1, as amended

by St. 1936, c. 68. Ground 9, asserting that the "bill erroneously seeks a trial de novo upon issues of fact other than those involving the constitutionality of the department's order," misconstrues the allegations of the bill.

The remaining grounds are (ground 11) that the "bill erroneously seeks to review findings of fact of the department"; and (ground 8) that the bill contemplates a trial de novo of the facts on the issues of confiscation and unlawfulness, and fails to show that these issues should not be determined upon the evidence received by the department. In so far as ground 8 seeks to delimit the scope of admissible evidence, it could not furnish a valid reason for sustaining the demurrer. Both grounds could be dismissed by saying that the allegations of the bill, which contains no copy of the order, do not disclose that the order does not show on its face that it is confiscatory. Even on these contentions of the department the case could proceed to hearing for the purpose of introducing the department's order in evidence. Inasmuch, however, as these two grounds involve the principles underlying the general subject of review in this court of rate regulation by the department, it is convenient at this point to consider all questions they seek to raise. These questions and related matters seem to be: (1) whether the reviewable questions include those arising under the State and Federal constitutions; (2) if constitutional questions are open here, whether the findings of the department are conclusive; and (3) if the findings are not conclusive, whether, under the statute, the questions reviewed are to be determined exclusively upon the evidence introduced before the department, or are to be determined also upon such additional evidence as may be introduced by either party.

This court is given "jurisdiction in equity to review, modify, amend or annul any ruling or order" of the department, "but only to the extent of the unlawfulness of such ruling or order." G. L. (Ter. Ed.) c. 25, § 5. This, we have said in cases involving no constitutional question respecting rates, does not enable us to review or revise pure findings of

fact but empowers us to deal with rulings or orders of the department only to the extent that they are shown to be erroneous in law. *Boston & Albany Railroad* v. *New York Central Railroad,* 256 Mass. 600, 617–618 (order of department approving issue of bonds). *New England Telephone & Telegraph Co.* v. *Department of Public Utilities,* 262 Mass. 137, 141, 147 (order requiring telephone service to be furnished where wires had not been pulled by the company). *Boston & Albany Railroad* v. *Department of Public Utilities,* 314 Mass. 634, 636 (order that certain work upon a bridge was an alteration and not repairs). *Lowell Gas Light Co.* v. *Department of Public Utilities,* 319 Mass. 46, 47 (order denying approval of proposed issue of stock). The same statement is to be found as to similar statutes in earlier cases, in only one of which were rates challenged as confiscatory by a public service company. *Paine* v. *Newton Street Railway,* 192 Mass. 90 (review under R. L. c. 112, § 100, of order of board of railroad commissioners approving an extension of street railway tracks). *Fall River* v. *Public Service Commissioners,* 228 Mass. 575, 580–581 (petition of a city under St. 1913, c. 784, § 27, for review of order of the public service commissioners permitting the discontinuance of "strips of six tickets" by a street railway company). *Donham* v. *Public Service Commissioners,* 232 Mass. 309, 328 (review under St. 1913, c. 784, § 27, of order relating to fares). *City Council of Salem* v. *Eastern Massachusetts Street Railway,* 254 Mass. 42, 45 (review under G. L. c. 161, § 142, of order of department refusing to approve a revocation of a track location by the city council).

The *Donham* case presented a situation which this court regarded as unique (pages 318–319). The receiver of a street railway company filed in abnormal times a schedule of rates which for the immediate future would not yield a "compensatory return upon the investment" (page 319). The public service commissioners disapproved that schedule and ordered the receiver to file another one (to be effective during a short trial period) which this court thought that there was good ground to believe would be as profitable

(page 323). The receiver's bill was dismissed. In denying a contention that all parties heard or entitled to be heard before the commissioners were entitled to be heard here, it was said, at page 328, "The findings of fact of the commission are not to be reviewed or revised by the hearing of evidence *in a case like the present*" (emphasis supplied). The allegations of fact in the bill, to which were annexed copies of the report and order of the commission, were admitted by the answer (page 311), and the questions for decision were necessarily considered on the bill and the face of the report and order. The *Donham* case is not an authority for the department.

The statement, that under G. L. (Ter. Ed.) c. 25, § 5, this court cannot review or revise facts, has no application where constitutional rights respecting rates are involved. In such cases the statute must be understood to confer plenary equity jurisdiction. That comprises the power to enjoin the confiscation of property, used and useful in the public service. *Prentis* v. *Atlantic Coast Line Co.* 211 U. S. 210, 230–231. *Louisville & Nashville Railroad* v. *Garrett*, 231 U. S. 298, 311. *San Joaquin & King's River Canal & Irrigation Co.* v. *County of Stanislaus*, 233 U. S. 454. *Missouri* v. *Chicago, Burlington & Quincy Railroad*, 241 U. S. 533, 538. *Oklahoma Operating Co.* v. *Love*, 252 U. S. 331. *Prendergast* v. *New York Telephone Co.* 262 U. S. 43, 49. *New York* v. *Maltbie*, 303 U. S. 158, 160. *Staten Island Edison Corp.* v. *Maltbie*, 296 N. Y. 374. Otherwise, the statute would not be broad enough for the enforcement of the rights guaranteed by the Declaration of Rights, and, according to many pronouncements of the Supreme Court of the United States, by the Fourteenth Amendment. An order imposing confiscatory rates is manifestly unlawful.

The Supreme Court has often said that, in all cases where there is an order, legislative in character, prescribing a complete schedule of maximum future rates, "if the owner claims confiscation of his property will result, the State must provide a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own in-

dependent judgment as to both law and facts; otherwise the order is void because in conflict with the due process clause, Fourteenth Amendment." *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U. S. 287, 289. *Prendergast* v. *New York Telephone Co.* 262 U. S. 43, 50. *Bluefield Water Works & Improvement Co.* v. *Public Service Commission of West Virginia,* 262 U. S. 679, 689. *Crowell* v. *Benson,* 285 U. S. 22, 60, 64. *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 51–52. See *Tagg Bros. & Moorhead* v. *United States,* 280 U. S. 420, 443–444; *Phillips* v. *Commissioner of Internal Revenue,* 283 U. S. 589, 600. The Constitution of this Commonwealth contains safeguards against deprivation of property without due process of law "at least as strong as those of the Fourteenth Amendment to the United States Constitution." *Pizer* v. *Hunt,* 253 Mass. 321, 332. See *Commonwealth* v. *Strauss,* 191 Mass. 545, 550; *Attorney General* v. *Brissenden,* 271 Mass. 172, 184; *King* v. *Grace,* 293 Mass. 244, 247.

Although the "subject of rate making by the Legislature or by public officers or boards has not been discussed in many decisions in this Commonwealth" (*Opinion of the Justices,* 251 Mass. 569, 610; see *Donham* v. *Public Service Commissioners,* 232 Mass. 309, 315), similar statements are to be found in our own reports. In *Opinion of the Justices, supra,* at pages 610–611, it was said, "A fundamental principle of rate making by public authority is that in general the rate so established must be sufficient to yield a fair return on the reasonable value of the property used or invested for doing the business after paying costs and carrying charges. Rates not sufficient to yield such return are unjust, unreasonable and confiscatory. That is the general rule. The making of rates may be treated as a legislative or executive function." Here followed the sentence quoted above from the *Ben Avon* case, with the comment, "That statement is equally interpretative of arts. 1, 10, and 11 of the Declaration of Rights of the Constitution of this Commonwealth. . . . Whenever heretofore the General Court has made provision for the fixing of rates by public

authority, there has always been, so far as we are aware, express provision for such review by the courts as to satisfy constitutional requirements. See G. L. c. 25, § 5; c. 152, §§ 13, 11." In *New England Telephone & Telegraph Co.* v. *Department of Public Utilities,* 262 Mass. 137, the *Ben Avon* and later cases of the Supreme Court of the United States were cited and their doctrine adopted in these words (page 142): "There must be a fair opportunity for submitting the issue of confiscation or of undue interference with the right of management to a judicial tribunal for determination upon its own independent judgment as to both law and facts." In *Horton* v. *Attorney General,* 269 Mass. 503, 509, it was said, "Reliance is placed in this connection on that part of the *Opinion of the Justices,* 251 Mass. 569, found at pages 610, 611. It there was said in substance that, where rates to be charged for public utility service by private persons or corporations were regulated by public authority, provision must be made for judicial review of the rates so established to the end that they may be reasonable, yield a fair return upon the value of the property employed after paying costs and carrying charges, and that final determination of such rates could not be vested in a public officer as was expressly provided in the proposed bill then under consideration. What there was said, with ample citation of authoritative decisions, is now adopted and affirmed."

It must, therefore, be taken to be the law of this Commonwealth, not often stated, to be sure, but nevertheless unanimously, that the Declaration of Rights guarantees to an owner, who alleges that confiscation of his property will result from a rate order of the department, a fair opportunity for submitting that issue to a court for determination upon its own independent judgment as to both law and facts, and that G. L. (Ter. Ed.) c. 25, § 5, affords him a remedy adequate to enforce that right. We see no occasion for embarkation on a different course at this time. At a later point in this opinion we shall return to the statement that the rates must yield a fair return upon the value of

the property employed after paying costs and carrying charges.

It is unnecessary for us to undertake to estimate the effect upon the doctrine of the *Ben Avon* case of certain relatively recent cases in the Supreme Court of the United States. See, for example, *Federal Power Commission* v. *Natural Gas Pipeline Co.* 315 U. S. 575; *Federal Power Commission* v. *Hope Natural Gas Co.* 320 U. S. 591; *Colorado Interstate Gas Co.* v. *Federal Power Commission,* 324 U. S. 581; *Panhandle Eastern Pipe Line Co.* v. *Federal Power Commission,* 324 U. S. 635. Compare *Market Street Railway* v. *Railroad Commission of California,* 324 U. S. 548, 567. We do not rest our decision upon a violation of the Fourteenth Amendment to the Constitution of the United States.

Our conclusion means that inquiry here on the issue of confiscation is not confined to the findings of the department or to the evidence introduced before the department. See *Crowell* v. *Benson,* 285 U. S. 22, 63. A determination of rates is necessarily made in large part upon a view taken through the dim lenses of prophecy. When a rate order is challenged on constitutional grounds in this court, our observations must be undertaken with the improved vision of intervening experience. And such, for many years at least, was the position of the Supreme Court. *Galveston Electric Co.* v. *Galveston,* 258 U. S. 388, 390–391, 401. *Smith* v. *Illinois Bell Telephone Co.* 282 U. S. 133, 161–162. *McCart* v. *Indianapolis Water Co.* 302 U. S. 419, 421–422. *United Gas Public Service Co.* v. *Texas,* 303 U. S. 123, 145–146.

### The appointment of a master.

The department's contention that there was no jurisdiction to appoint a master, and that the "appointment was void," obviously cannot be upheld. It raises no question not hereinbefore considered. The rule directed the master "to hear the parties and their evidence, to find the facts and report the same to the court." In this there was no error.

The exceptions to the master's report.

The exceptions to the master's report and to the supplemental report call for no extended discussion. Of the fifty exceptions to the report, a great many were to findings of fact. These are wholly nugatory. They ignore the elementary rule that an exception to a master's report can achieve nothing unless error appears on the face of the report itself. *Leventhal* v. *Jennings,* 311 Mass. 622, 624. *Minot* v. *Minot,* 319 Mass. 253, 258. Findings purporting to be based upon unreported evidence must stand where there is nothing in the subsidiary findings inconsistent with general findings. *Sprague* v. *Rust Master Chemical Corp.* 320 Mass. 668, 675, and cases cited. *Weltshe* v. *Graf,* 323 Mass. 498, 500. Of no importance now are those exceptions charging the master with making erroneous rulings of law. The only questions now properly open are as to the rights of the plaintiff on the facts found. *Adams* v. *Young,* 200 Mass. 588, 590. *Anglim* v. *Brockton,* 278 Mass. 90, 94. *Gadreault* v. *Hillman,* 317 Mass. 656, 663. Exceptions to statements of the contentions of the parties require no comment. Exceptions asserting that the report does not disclose the theories of law upon which the master proceeded are not justified. Statement of the grounds of the remaining exceptions would serve no useful purpose. We have considered all the exceptions, and we think them to be totally lacking in merit.

The supplemental report merely presents facts to enable the court to pass upon the correctness of four rulings relating to the admission and exclusion of evidence as to which the department filed objections, which have become exceptions. The department did not follow the proper method of raising the questions intended. The remedy was by motion to recommit if the department was not satisfied with the master's statements of facts bearing upon the rulings upon evidence. *Carleton & Hovey Co.* v. *Burns,* 285 Mass. 479, 484.

The exceptions to the master's report and to the supplemental report were properly overruled.

### The department's motions.

The department's six motions, four to recommit to the master, one to reopen the hearing, and one to amend the order of reference to require the master to append to his report a transcript of the testimony before him, were all rightly denied.   Three of the motions to recommit and the motion to reopen the hearing were for the purpose of reporting evidence.   Their denial shows no abuse of discretion.   *Pearson* v. *Mulloney,* 289 Mass. 508, 513. *Zytka* v. *Dmochowski,* 302 Mass. 63, 67.   Another motion sought to strike out forty-five findings from the report. These were in the nature of exceptions, and "no additional exceptions may be filed without a special order of the court."   Equity Rule 26 (252 Mass. 608).   *Respro, Inc.* v. *Worcester Backing Co.* 291 Mass. 467, 472.   *Ingram* v. *Eichel's Spa, Inc.* 313 Mass. 109, 113–114.   The remaining motion, to amend the order of reference, was filed after the filing of the master's report.   This was too late.   *Cook* v. *Scheffreen,* 215 Mass. 444, 448.   *American Agricultural Chemical Co.* v. *Robertson,* 273 Mass. 66, 80.   The only suggestion of error as to any of the motions seems to be that the master's report discloses that he proceeded upon incorrect principles of law.   As we have already indicated, this contention is unsound.

### Determination of the proper decree.

As there was no error in confirming the master's reports, it remains for us to determine what decree justice and equity require.   The report contains a copy of the department's order.

### The order of the department.

We shall make a concise statement of the salient parts of the order.   The schedule filed December 12, 1946, is estimated to increase revenues $168,000.   On that date the company was operating under a schedule which had been in effect since January 1, 1942.   The total plant in-

vestment on December 31, 1946, was $4,007,428.74, and the company had set up a depreciation reserve of $850,786.76. The par value of outstanding common stock is $1,524,050, and there is no premium account.[1]  On December 31, 1946, there were outstanding $1,075,000 in twenty-five year three and one half per cent[2] notes, due in 1971, and the stated earned surplus was $473,864.63.   The company's revenues have increased yearly since 1941, principally from increased sales due to war activity, and partly from the 1942 rate increase.   Operating revenues were $770,015 in 1941 and $1,114,519 in 1946.   This increase of $344,504 has been largely offset by an increase of $320,072 in operating expenses, which were $474,127 in 1941 and $794,199 in 1946.   Nonoperating income showed a loss of $11,291 in 1941 and a profit of $41,315 in 1946, a net gain of $52,606, resulting from a large increase in appliance sales, principally in 1946, which may or may not be permanent.   The increased earnings would have been a great deal more had it not been for an increase in taxes.   The accruals for Federal income taxes were $20,248 in 1941, $33,750 in 1942, $34,203 in 1943, $47,000 in 1944, $64,714 in 1945, and $61,701 in 1946.   Earnings reported to the department, after deducting such accruals, were $88,228 in 1941, $93,217 in 1942, $113,538 in 1943, $131,108 in 1944, $149,070 in 1945, and $146,371 in 1946.   The American Business Associates, a Massachusetts voluntary association, owns ninety-eight per cent of the capital stock of the company.   Owing to the filing of consolidated returns by the holding company,[3] the amounts accrued for Federal income taxes have not been paid from 1942 on.[4]   As "this so called liability is, under existing

---

[1] It appears from the master's report that there had been such an account, made up of payments by subscribers to capital stock, but that it had been charged off, partly in compliance with a conditional order of the department approving an issue of bonds, and partly to eliminate an item of indebtedness resulting from a loan to the holding company which was disapproved by the department.

[2] The rate was reduced from four and one half per cent by refinancing in 1946.

[3] See U. S. C. (1946 ed.) Title 26, § 141.

[4] The $20,248 accrued in 1941 was paid, but the $33,750 (due in 1943) accrued in 1942 was carried as a liability until the three year limitation for review of that year's return had expired.   In 1946, $33,750 was credited to surplus.

regulations, actually no liability at all," the item of $61,701 for 1946 taxes is disallowed. There were sharp increases in costs during 1946, and on the basis of October 31, 1946, prices and wages, operations after the accrual for Federal taxes would have resulted in estimated net earnings of only about $130,000. Increases in 1947 of $54,000 in wages and $25,000 in local taxes reduce the estimated net return on this basis to about $51,000. "This amount would be insufficient to provide a fair return . . . . It is obvious that some increase in rates must be granted." The company must expand its plant facilities in the near future. "The company expects very shortly to spend upwards of $1,000,000 in expanding its capacity and on its distribution facilities. In view of the present capital structure of the company, at least a large portion of this expansion must be financed by the issuance of junior securities necessitating a relatively high rate of return. The revision in rates herein approved should provide a net of $100,000 in increased revenues on the basis of estimates made by the company. We are of the opinion that this revenue together with revenues received from increased sales will be sufficient for the company to meet its increased costs and at the same time pay a reasonable dividend on its outstanding stock. It appears that with this increase the annual earnings of the company should approximate $125,000 on the basis of October 31st prices and wages and after taking into consideration the 1947 wage increase and local tax increases. However, should costs continue to increase to the extent estimated by the company it is conceivable that this figure may be materially reduced. . . . If it should develop that the earnings of the company reach $125,000, such earnings would approximate eight per cent on the capital of $1,524,050 or about six per cent on the capital and surplus of $1,997,914. On the depreciated plant investment [1] of the company, the overall return

---

[1] It is not apparent what this amount is. It obviously must be much smaller than the figure obtained by deducting from the amount found to be the plant investment ($4,007,428.74) the amount found to be the depreciation reserve ($850,786.76).

would be over five per cent. These rates of return are, in our opinion, adequate to meet respondent's needs for additional revenue at this time and we so find."

The order, thus summarized in detail, is virtually barren of findings which reveal the principles underlying the department's conclusions or which would enable the public or the company intelligently to take future action in conformity with those principles. To be sure, the order states, "It has been the practice in Massachusetts since the inception of public regulation of utility rates (see *Customers* v. *Northampton Electric Lighting Co.* D. P. U. 4370,[1] *Re Lowell Gas Light Co.* D. P. U. 5418[2]), to take into consideration the actual prudent investment in the utility in computing a fair return." And in *Donham* v. *Public Service Commissioners*, 232 Mass. 309, 313, it was said thirty years ago, "The rule established by the public service commissioners for their guidance in fixing rates in an earlier case and apparently intended to be followed by them in others, so far as applicable, is that under the Massachusetts law 'capital honestly and prudently invested must, under normal conditions, be taken as the controlling factor in fixing the basis for computing fair and reasonable rates,' and that 'such rates are to be allowed as will yield a fair return upon such investments.' *Bay State Rate Case*, 4 Mass. P. S. C. Rep. 11, 12."

The department's brief contains such statements as: "its so called 'prudent investment theory' . . . in plain language means the net cost of investment less depreciation as the base upon which rates should be granted subject, of course, to the particular circumstances and conditions that prevail in the particular utility concerned"; "the amount on which a fair return should be allowed is the authorizable capital stock"; "the regulation of rates should be guided by the amount of capital stock honestly and prudently invested by the stockholders rather than the value of the property employed"; and "a fair return upon the capital actually invested is required."

[1] 36 P. U. R. (N. S.) 353.
[2] 22 P. U. R. (N. S.) 138.

Lowell Gas Co. *v.* Department of Public Utilities.

There is nevertheless no clear cut finding of a rate base to which a percentage of return can be applied. We are not sure whether the department regarded either the capital stock or the capital stock and surplus as the amount of the prudent investment in this case. If so, the amount was only a guide, and undisclosed conditions peculiar to this company apparently may have been controlling. However this may have been, a finding of a percentage return on the capital stock, or on the capital stock and surplus, would not be a finding on a rate base of the amount of prudent investment in any commonly accepted meaning of the term. See, for example, *Galveston Electric Co.* v. *Galveston,* 258 U. S. 388, 391;[1] *Missouri* v. *Public Service Commission of Missouri,* 262 U. S. 276, 289 note, 295 note (dissenting opinion of Mr. Justice Brandeis[2]). The same would be true of the reference to a percentage return on the depreciated plant investment. The plant investment of $4,007,428.74 given in the order is, it appears from the master's report, a book figure taken from the company's annual return. This figure might be much more or much less than the prudent investment, and rates related to it might be correspondingly unfair to the consumer or to the company. It would seem that the department did not regard this as an important factor anyway.

The department has professed to adhere to its rule notwithstanding the statements of the Supreme Court of the United States and of this court that the rates must be sufficient to

[1] Mr. Justice Brandeis refers to the "undepreciated reproduction cost on the historical basis — which seems to be substantially equivalent to what is often termed the prudent investment . . . ."

[2] These citations are to a dissenting opinion of Mr. Justice Brandeis who, at page 295 note, said, "Historical cost, i. e., the proper cost of the existing plant and business, estimated on the basis of the price levels existing at the respective dates when the plant and the additions were constructed. This is often called prudent investment. . . . Historical cost . . . is the amount which normally should have been paid for all the property which is usefully devoted to the public service. It is, in effect, what is termed the prudent investment." Compare the department's answer in the case at bar, where it is alleged that "a court is not bound to consider evidence of the fair or historical value of the company's plant in the determination of rates." See also dissenting opinion of Commissioner Eastman in *San Pedro, Los Angeles & Salt Lake Railroad* case, 75 I. C. C. 463, 523; Bauer, Effective Regulation of Public Utilities, 244–245; Bauer, "The Establishment and Administration of a 'Prudent Investment' Rate Base," 53 Yale L. J. 495, 506–507.

yield a fair return on the value of the property employed
after paying costs and carrying charges.  See *Opinion of the
Justices,* 251 Mass. 569, 610; *Horton* v. *Attorney General,*
269 Mass. 503, 509.  It is unnecessary to expatiate upon
this aspect of the case, as in any event the order, as will be
seen, is confiscatory.

### The master's report.

The master's report contains findings on three theories as
to rate base.  (1) The cost of plant and equipment now in
use and useful is $4,827,000, exclusive of working capital in
the amount of $340,302.  Depreciation is $850,786.76.  (2)
The "amount of the prudent investment in the used and use-
ful property" is not less than $4,590,000.  (3) The fair value
of the property is $4,827,000 exclusive of working capital.

Since the order mentioned prudent investment, we shall
repeat only the detailed findings which the master made as
to this theory.  Up to December 31, 1946, the investment
in the property was as shown in the following table:

| | |
|---|---:|
| Capital stock at par | $1,524,050 |
| Premiums paid for stock | 778,687 |
| Bonds and long term notes | 1,075,000 |
| Notes payable | 140,000 |
| Surplus | 473,865 [1] |
| Paid out of earnings | 990,551 [1] |
| | $4,982,153 |

By August 31, 1947, the investment had increased to
$5,126,746.  This larger total took into account certain
capitalizable expenditures for which the department had
authorized additional bonds; the inception of the additions

---

[1] *Public Utility Commissioners* v. *New York Telephone Co.* 271 U. S. 23, 31, 32.  *United States* v. *Public Utilities Commission of District of Columbia,* 158 Fed. (2d) 533, 537 (C. A. D. C.), certiorari denied 331 U. S. 816.  See *Fall River Gas Works Co.* v. *Gas & Electric Light Commissioners,* 214 Mass. 529, 539.  In *Mayor of Springfield* v. *United Electric Light Co.* 39 P. U. R. (N. S.) 135, 139, the department said that "plant acquired by the use of sur-plus as properly belongs in the rate base as plant acquired with the proceeds of a stock issue."

and improvements contemplated by the company and referred to in the department's decision as costing more than $1,000,000; and the increase of notes payable from $140,000 to $200,000. On July 17, 1947, the department authorized an issue of $500,000 in preferred stock to raise funds to start the new work, and $60,000 of this amount had been spent by March 31, 1947. [1] The master, accordingly, added to the present investment the sum of $440,000, making a total of $5,566,746. From this he deducted the premium account, $778,687 (in effect finding it not to be a prudent investment in the particular circumstances); the amount invested in the merchandise and jobbing business (the sale and servicing of appliances, including gas stoves, and other articles with which gas is used), $171,809; and property not used and useful, $24,676; leaving a balance of $4,591,574.

The master's report also contained findings showing the amount of earnings necessary to assure confidence in the financial integrity of the enterprise and to enable the company to maintain its credit and attract new capital. This right, as has already been noted, is conceded by the department in its answer. The department also contends for it in its brief. These findings are bond interest, $44,406; noninterest bearing obligations, $16,000; preferred stock dividends, $25,000; [2] common stock dividends, $177,405; making a total of $262,811. The figure for common stock dividends is based on a finding that ten thousand new shares of common stock would soon have to be issued, and could be sold at par ($25) if the company could pay a dividend of eight per cent and earn ten per cent on such stock. [3]

The master stated, "If the determination of a reasonable rate of return upon such rate base as may be adopted is a

---

[1] The master also said, "Although it seems reasonable to suppose that the remaining $500,000 will also be required in the not too distant future, that additional amount is not taken into account."

[2] On July 17, 1947, the department approved an issue of twenty thousand shares of preferred stock with $25 par value, to carry a dividend rate not in excess of five per cent, and to be sold at not less than par.

[3] When issued these new shares would bring the total of common stock up to seventy thousand nine hundred sixty-two shares.

question of fact, I find it to be six per cent." He found that on account of the competition to which gas companies are subjected and the comparative instability of their earnings, they are entitled to a somewhat higher rate of return than are electric companies.

The master further found that the annual earnings available, before interest, for the return on its capital, without including income from the merchandise and jobbing business and not deducting as an expense the reserve for Federal income taxes or the annual amount payable on certain noninterest bearing obligations, are reasonably expected to be for the calendar year 1947, approximately $165,000, and for the twelve months beginning May 1, 1947, approximately $138,500. If the reserve for Federal income tax may properly be charged to earnings, he found that these figures would be reduced, for the calendar year 1947, to $137,433, and for the twelve months beginning May 1, 1947, to $118,946. Finally, the master found that the estimates for the calendar year 1947 show the balance, after the Federal tax reserve and after interest ($44,406), available for dividends and noninterest bearing obligations ($16,000 a year) to be $93,027, and for the twelve months beginning May 1, 1947, $72,909.

The hearings before the master took place in the latter part of 1947, and the estimates of earnings made at the time of the hearing before the department could be tested by the actual experience of the company for the first eight months in 1947. In his estimates of sales, the amount through August, 1947, is that actually made, and for the months beginning September, 1947, he assumed that the amount would be no greater than for the corresponding months of 1946. This assumption was made because of economic conditions in Lowell and a very definite falling off in the demand for heating and the loss of heating customers. Although there was a considerable increase in sales in the early part of 1947 over the corresponding months of 1946, there was a rapid decline in the increase each month from June through August, 1947, and in September, 1947,

the sales were substantially the same as in September, 1946.

Other findings of the master were that the department's estimate of $125,000 in earnings after bond interest included earnings from the merchandise and jobbing business, [1] and made no allowance for payments on noninterest bearing obligations and, as we have seen, the Federal income tax reserve.

### The merchandise and jobbing business.

The income from the merchandise and jobbing business is not to be included in the company's income for the purpose of rate making. The department does not permit losses on such business to be included in expenses in determining net earnings for that purpose, nor does it allow capital devoted to that business to serve as a basis for the issue of securities or to be counted as part of the investment for rate making. The sale and servicing of gas appliances constitute a separate business from the supplying of gas. See *MacRae* v. *Selectmen of Concord,* 296 Mass. 394, 398; *Opinion of the Justices,* 300 Mass. 591, 593. It would not be fair, on the one hand, to charge all customers with higher rates so that some might buy appliances and have them serviced at less than cost, or, on the other hand, to lower the cost of gas service because of a profit on those items. The treatment of these revenues in the order of the department was not only inconsistent with its own practice, but was erroneous in law.

### Payments on noninterest bearing obligations.

The annual payment on noninterest bearing obligations, which the master found that the department "failed to allow as an expense" in its estimate that the rates would produce annual earnings of $125,000, must be made for seven

[1] We cannot say on this record at what figure such earnings were included. There were findings of the master as follows: For 1946 the revenue from this business was $40,058, which was due to the tremendous demand for appliances following the war and was many times larger than for any year since 1930. Out of the seventeen years which were considered, there were losses, often substantial, in all but four years. The net loss for the period was $25,068, even including the substantial profit in 1946. The revenue from this business is neither permanent nor stable. For 1947 it will not exceed $10,000.

more years.  These obligations, it appears from the master's report, were issued pursuant to a settlement of claims which were asserted against the company and provide for the payment of $16,000 a year out of net earnings available for dividends.  No question was raised before the master as to the wisdom or propriety of the settlement which led to the issue of these obligations.  The department's contention before us is that they "represent no real indebtedness of the company," but are a "moral obligation to the customers of the Lowell Gas Company, who had purchased the preferred stock of the American Commonwealth Power Corporation and had lost their money in that stock."  We are referred to *Re Lowell Gas Light Co.* 22 P. U. R. (N. S.) 138, 149–150, an earlier rate case of the same company, where the department in 1937 refused to allow these payments to be reckoned in costs so as to raise the price of gas, saying, "It is not unreasonable in the public interest to require that the discharge of this 'moral obligation,' so called, should be deferred until more prosperous times, if thereby a rate increase may be avoided; or be paid directly by the stockholders out of their own dividends, and not indirectly by the ratepayer."  If the department should ever make a finding that in the present more prosperous times, these obligations, which are legal obligations, although perhaps moral in origin, do not represent a part of the prudent investment, we might not take issue with that conclusion.  On the record, however, the payments on these obligations are a charge against earnings with priority over dividends.

### The Federal income tax reserve.

The company argues that the Federal income tax reserve was improperly disallowed as an expense by the department. It appears from the master's report that while the holding company and the company are allowed to file a consolidated return, the interest on the debt of the holding company exceeds the income of the company "and therefore it may be that no tax is payable"; and that the company nevertheless has adopted the practice of setting up a reserve for this

tax each year, for the reason it has been advised that it cannot be certain that such a consolidated return and the advantages derived therefrom will be allowed, especially in view of the fact that the interest charges of the holding company have actually been paid only to a very limited extent. We see no occasion to decide this question, which depends upon present and future Federal tax laws and their administration, as, regardless of the amount therein involved, the order of the department cannot be upheld.

## Reasonable rate of return.

The annual earnings for the calendar year 1947 upon the schedule of rates authorized by the department, according to the master's findings, are reasonably expected to be $165,000, exclusive of the merchandise and jobbing business. Deducting the bond interest of $44,406 and $16,000 for payment on noninterest bearing obligations [1] leaves available for dividends $104,594, without any reserve for Federal income tax. For the twelve months' period beginning May 1, 1947, deducting the same items from $138,500, the reasonably to be expected earnings, as found by the master, leaves less than $80,000 available for dividends. The latter figure, in our opinion, more accurately indicates the effect of the order during the major period in which it was designed to operate. It is insufficient to assure confidence in the financial integrity of the enterprise so as to maintain its credit and attract new capital. This figure is far less than the amount of $202,405 ($262,811 less $44,406 less $16,000) that the master found would be required for the purpose. On the common stock capitalization of $1,524,050 (sixty thousand nine hundred sixty-two shares at $25) taken by the department, earnings of $55,000 ($80,000 less $25,000) would permit a dividend of about three and one half per cent, and on this amount of capitalization plus surplus ($473,864), a

---

[1] Whether part of the prudent investment or not, this item, representing legal obligations having precedence over dividends, cannot be disregarded in estimating the amount of earnings necessary to assure confidence in the financial integrity of the enterprise so as to maintain its credit and attract new capital.

total of $1,997,914, would yield about two and three quarters per cent. On a common stock capitalization of $1,774,050 (seventy thousand nine hundred sixty-two shares at $25) taken by the master, this would permit a dividend of a little over three per cent, and on that capitalization plus surplus, a total of $2,247,914, would allow a return of less than two and one half per cent. Consequently, irrespective of whether the earnings permitted by the order were, or should have been, proportional to any rate base, whatever may have been the theory upon which such rate base was, or should have been, determined, the order of the department under date of April 15, 1947, is confiscatory.

This opinion is that of a majority of the court.

### Conclusion.

The interlocutory decrees reported are affirmed. A final decree is to be entered annulling the order of the department dated April 15, 1947.

*So ordered.*